1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,    : 19CR386(PKC)
4                               :
           Plaintiff,           :
5                               :
           -against-            : United States Courthouse
6                               : Brooklyn, New York
   MUSTAFA GOKLU,               :
7                               :
           Defendant.           : Monday, October 3, 2022
8                               : 9:00 a.m.
                                :
9                               :
                                :
10
   - - - - - - - - - - - - - X
11
        TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
12             BEFORE THE HONORABLE PAMELA K. CHEN
                 UNITED STATES DISTRICT JUDGE
13
                   A P P E A R A N C E S :
14
   For the Government: United States ATTORNEY'S OFFICE
15                         Eastern District of New York
                           271 Cadman Plaza East
16                         Brooklyn, New York 11201
                     BY:   GILLIAN KASSNER, ESQ.
17                         MARIETOU E. DIOUF, ESQ.
                           FRANCISCO NAVARRO, ESQ.
18                         Assistant United States Attorneys

19  For the Defendant:    MURRAY E. SINGER, ESQ.
                           14 Vanderventer Avenue, Suite 147
20                         Port Washington, New York 11050
                      SAHLI LAW PLLC
21                         195 Broadway, 4th Floor
                           New York, New York  11211
22                    BY:EMILEE SAHLI, ESQ.

23

   Court Reporter:    SOPHIE NOLAN
24                     225 Cadman Plaza East/Brooklyn, NY 11201
                       NolanEDNY@aol.com
25  Proceedings recorded by mechanical stenography, transcript
    produced by Computer-Aided Transcription

              SN      OCR      RPR

COURT'S
EXHIBIT NO. #4
IDENTIFICATION/EVIDENCE
DKT.# 19CR386
DATE: 10/7/2022





SG        OCR        RPR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19      MS. KASSNER:  The Government calls DEA Special Agent

20  Lilita Infante.

21      THE COURT:  So Ladies and Gentlemen, since we got a

22  late start in the afternoon session, I'm going to dispense of

23  our 15-minute break, but if anyone needs a nature break,

24  please raise your hand.  So we can get in more presentation

25  today.

1        Agent, if you will approach the witness stand and

2   remain standing for a moment so you can be sworn in.

3        THE COURTROOM DEPUTY:  Do you solemnly swear or

4   affirm that the testimony you are about to give in this case

5   now before the Court, will be the truth, the whole truth and

6   nothing but the truth.

7        THE WITNESS:  I do.

8        THE COURTROOM DEPUTY:  Please state and spell your

9   name for the record, please.

10       THE WITNESS:  Lilita Infante; L-I-L-I-T-A.

11   I-N-F-A-N-T-E.

12       THE COURT:  You may have a seat.

13                    .

14       (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

1  **LILITA INFANTE,**

2           having been first duly sworn, was examined and

3           testified as follows:

4  DIRECT EXAMINATION

5  BY MS. DIOUF:

6  Q    Good afternoon, Special Agent Infante.

7           I'm here in the back at the podium a few feet away

8  from you.

9  A    Good afternoon.

10 Q    Special Agent Infante, are you employed?

11 A    Yes.

12 Q    Where do you work?

13 A    I work at the Drug Enforcement Administration.

14 Q    Is the drug information administration --

15          MS. KASSNER:  Special Agent Infante, if you could

16 remove your mask while you're testifying.  Thank you.

17 Q    Is the Drug Enforcement Administration also known as the

18 DEA?

19 A    Yes, it is.

20 Q    And you mentioned you are a special agent.

21          What is the special agent at the DEA?

22 A    Special agent at the DEA is -- investigates narcotics and

23 money laundering crimes.  Common duties will include writing

24 affidavits, issuing subpoenas, doing physical surveillance,

25 financial investigations as well, tracing elicit funds,

1    writing affidavits for wiretaps, executing search warrants and

2    arrest warrants, et cetera.

3    Q    How long have you been a special agent at the DEA?

4    A    Approximately nine years.

5    Q    What is your current assignment?

6    A    I currently work at the cyber -- Counter Narcotics Cyber

7    Investigation Task Force in the Miami field division.

8    Q    And prior to serving as a special agent at the DEA for

9    nine years, where did you attend college?

10   A    I attended Columbia University where I studied economics

11   and Harvard University where I studied general management.

12   Q    What are your duties and responsibilities in the Miami

13   office that you currently work at?

14   A    I investigate specifically cryptocurrency related crimes

15   that relate to narcotics and money laundering.

16   Q    What are cryptocurrency related crimes?

17   A    Anything that has to do with utilizing cryptocurrency in

18   furtherance of a crime.  Such as taking cryptocurrency as a

19   payment for elicit goods and services or using cryptocurrency

20   to launder money or hide the proceeds of an elicit illegal

21   activity.

22   Q    Approximately how many cryptocurrency enabled money

23   laundering and narcotics cases have you investigated?

24   A    Probably over 20 at this point.

25   Q    And approximately how many of those investigations

1   involved cryptocurrency?

2   A     All of them.

3   Q     Have you ever arrested an individual for money laundering

4   in connection with cryptocurrency?

5   A     Yes, on multiple occasions.

6   Q     Have you received any formal training in this area that

7   you investigate?

8   A     Yes.  I received training in tracing cryptocurrency,

9   Blockchain analysis, general financial investigations when it

10  comes to cryptocurrency, and narcotic sales on the internet as

11  well.

12  Q     Have you lead any trainings on cryptocurrency enabled

13  money laundering and narcotics trafficking offenses?

14  A     Yes.  I have lead several trainings all over the world

15  that include cyber investigations that have touched

16  cryptocurrency and narcotics trafficking on internet.

17  Q     Are you familiar with how cryptocurrency is accessed,

18  bought, exchanged and stored?

19  A     Yes, I am.

20  Q     And how are you familiar with that?

21  A     I have personally bought, exchanged, and stored

22  cryptocurrency in an undercover capacity in my cases and also

23  on a personal level as well.

24  Q     How many times have you bought, accessed, or stored

25  cryptocurrency through your work with the DEA?

Infante - direct - Diouf                    211

1   A    Through my work with the DEA probably around 30, 40
2   times.
3   Q    And have you been involved in exchanging cash into
4   cryptocurrency through your work with the DEA?
5   A    Yes, I have.
6   Q    And approximately how many times?
7   A    Probably anywhere from 30 to 40 times as well.
8   Q    And through your work with the DEA, have you opened
9   accounts on Bitcoin exchanges?
10  A    Yes.  I have on multiple occasions.
11  Q    Have you purchased Bitcoin on exchanges?
12  A    Yes, I have.
13  Q    And approximately how many times?
14  A    Probably around 20 to 30 times.
15  Q    Have you purchased Bitcoin through peer-to-peer
16  transactions?
17  A    Yes, I have as well.
18  Q    How many times have you testified either before a Grand
19  Jury or at trial?
20  A    Over a dozen times.
21  Q    Were you involved in the investigation of this case?
22  A    No, I was not involved.
23  Q    Did you conduct any interviews of participants in this
24  case?
25  A    No.

1   Q    Have you had any contact with the defendant?

2   A    No.

3           MS. DIOUF:   At this time the Government moves

4   pursuant to Federal Rule of Evidence 702 to qualify Special

5   Agent Lilita Infante as an expert in the areas of crypto

6   currency and the methods by which crypto currency are

7   typically stored, accessed, transferred and exchanged.

8           THE COURT:   Do you want to voir dire, Mr. Singer?

9           MR. SINGER:   No, Your Honor.  No objection.

10          THE COURT:   Then she will be so qualified.

11          MS. DIOUF:   Thank you.

12  BY MS. DIOUF:

13  Q    Special Agent Infante, what is digital currency?

14  A    Digital currency is essentially like Internet money.  It

15  is transacted on a peer-to-peer basis, which is one of the

16  main differences between digital currency and regular

17  currency, such as the U.S. dollar.  On a peer-to-peer basis

18  means there is no intermediary, such as a bank for example, or

19  a credit card company.  It is governed by a code, as opposed

20  to a Government printing money.  It is governed by basically

21  computing power and code.  Individuals can also buy sell and

22  exchange digital currency on centralized exchanges.

23  Q    Is digital currency another term for crypto currency?

24  A    Yes.

25  Q    How would digital currency compare to a 20-dollar bill I

Infante - direct - Diouf                    213

1  might have in my wallet?

2  A    When you have a -- first of all, a 20-dollar bill would

3  be considered fiat currency which is governed by for example

4  the U.S. Government.  Also in order to spend that 20-dollar

5  bill in your wallet would you have to physically be present

6  with whoever you are with you who you are transacting with;

7  while with crypto currency you can transfer value or make

8  payments across borders globally without having had to have

9  any kind of intermediary peer-to-peer, and without having to

10  be physically present with the individual.

11  Q    What can digital currency be used for?

12  A    Digital currency can be used to store value, to transfer

13  value across borders, to make payments for goods and services,

14  to make profits via trading, for example by buying low and

15  selling high because digital currency fluctuates in price as

16  well.

17  Q    Can you explain what you mean by store value?

18  A    So it can be used as a commodity, for example, kind of

19  like digital gold.  So because the price of the digital

20  currency a lot of time goes up over many years, you can use it

21  as a store value or an investment over time.

22  Q    Can you give us some examples of digital currency?

23  A    Like Bitcoin, Ethereum or Litecoin.

24  Q    What is Bitcoin?

25  A    Bitcoin is the first-ever crypto currency that was ever

1  invented.  It was first invented in January of 2009 by an

2  anonymous individual that went by the moniker of Satoshi

3  Nakamoto.  It was the first ever peer-to-peer decentralized

4  currency based on code.

5  Q    Is Bitcoin also known as BTC?

6  A    Yes, it is.

7  Q    Does Bitcoin exist in physical form?

8  A    No, it only exists in digital form.

9  Q    What does it look like?

10 A    The Bitcoin logo looks like an orange B with a line going

11 through it.

12 Q    How is Bitcoin priced?

13 A    Bitcoin is priced by the market.  So usually a

14 centralized exchange, such as for example, Coinbase or Binance

15 will set the price based on supply and demand.

16 Q    What is the price of one Bitcoin currently?

17 A    Currently it's approximately $19,000.

18 Q    What about in 2018?

19 A    In 2018 it fluctuated, averaged about $6,000.

20 Q    How do people store their Bitcoin?

21 A    One can store Bitcoin in a variety of ways.  One way is

22 to use a hosted wallet or a wallet on a centralized exchange,

23 such as Coinbase, for example, or Binance.  In this case the

24 centralized exchange will actually hold your Bitcoin for you,

25 and will allow you to buy and sell Bitcoin for fiat currency.

Infante - direct - Diouf                215

1   So you can connect your bank account and transact in that way

2   via the centralized exchange.

3              Another way you can store is it using an unhosted

4   wallet.  An Unhosted wallet is basically, it can be a software

5   that you can download to your computer or mobile device.  An

6   example of that would be Electrum on the computer or Mycelium,

7   a wallet on a mobile device.  And this kind of wallet would

8   allow you to store Bitcoin and transact in Bitcoin without

9   having to go through an intermediary such as an exchange.

10  Q    You mentioned Mycelium wallet, what is Mycelium?

11  A    Mycelium is a software wallet that can be used on a

12  mobile device such as iPhone or an android device.

13  Q    Special Agent Infante, I'd like to show you and the jury

14  what is in evidence as Government Exhibit 717, which was

15  recovered from the defendant's computer.  Can you see this

16  document?

17  A    Yes.

18  Q    What is this?

19  A    This is a back up of the Mycelium wallet.  So it has a

20  key pair, I think there is a key pair missing here, which are

21  two key codes.  So it would be a public key and private key.

22  Also a password that one can set to decrypt the private key

23  for the wallet.

24  Q    Let's go to the second page of the wallet.  Special Agent

25  Infante, what is this?

1  A    This is the private and public key pair for the, looks

2  like, a Bitcoin wallet from Mycelium.  What this means is

3  because this Bitcoin is based on encryption, every wallet will

4  have a public key, which is the key that you will give to

5  other people to send you money, so it looks like an

6  alphanumeric string of characters.  Then it also has a private

7  key, which you keep to yourself, which you could use to

8  recover your balance.

9         So let's say if you lost your phone and you need to

10 get a new phone, you have to download a new Mycelium wallet,

11 you would need that private key in order to recover the

12 balance of your wallet.

13 Q    Thank you.  You can take that exhibit down.

14        Special Agent Infante, how do people access their

15 Bitcoin to sell or exchange it using an unhosted wallet?

16 A    Using an unhosted wallet, one can do a peer-to-peer

17 exchange.  Which means that you would basically meet up with

18 whoever it is that you're transacting with, or you could agree

19 to use credit card payment or bank transfer.  And you would

20 trade directly with them using your unhosted wallet.

21 Q    How would someone access their Bitcoin to sell or

22 exchange using a commercial exchange?

23 A    With the commercial exchange, one would have to create an

24 account on the commercial exchange.  It's very similar to

25 creating a bank account, for example.  So you would create a

1  log in with a password.  You would have to provide identity

2  verification, like would you with a bank account.  Then you

3  would link your bank account or your credit card to your

4  centralized exchange account, that way the exchange will allow

5  you to buy or sell digital currency through the exchange.

6  Q    You mentioned that people can use Bitcoin to purchase

7  things and conduct other financial transactions.  Are all

8  Bitcoin payments recorded somewhere?

9  A    Yes.  Every Bitcoin transaction is recorded on a public

10 ledger called the blockchain.  This is a public ledger that

11 can be accessed by anybody with an Internet connection.  So

12 you can go on a website and actually see every single

13 transaction that ever transpired on the Bitcoin blockchain.

14 Q    So is it fair to say that Bitcoin blockchain exists

15 throughout the world?

16 A    Yes.

17 Q    Does every Bitcoin transaction impact the global

18 blockchain?

19 A    Yes, absolutely.

20 Q    Can you conduct a Bitcoin transaction without using the

21 Internet?

22 A    No.

23 Q    Why not?

24 A    Because in order to send funds via Bitcoin, you would

25 have to connect to the blockchain.  And in order to connect to

1  the blockchain, you would need to connect to the Internet.

2  Q    How does the one access information stored in the Bitcoin

3  blockchain?

4  A    It's very simple.  You can go online to various, they are

5  called block explorers, and you can check the date or

6  transaction number or even a wallet address, and the

7  blockchain will give you information about those transactions.

8  So for example if you have conducted a transaction, you can

9  put in a transaction number, called a hash.  It will give you

10 who sent it or the actual Bitcoin address of the alphanumeric

11 string of characters of the sender.  It will give you the

12 alphanumeric of the address of the receiver.  It will give you

13 the exact date and time and the amount that it was sent as

14 well.

15 Q    Are the identities of individuals or entities behind

16 wallet addresses recorded on the public ledger?

17 A    No.  The only thing that is recorded would be the

18 alphanumeric characters of the address wallets.

19 Q    How do people acquire Bitcoin?

20 A    There are multiple ways to acquire Bitcoin.  One would be

21 to use one of the centralized exchanges, such as Coinbase for

22 example.  Set up an account, verify your identity, then you're

23 able to link your bank account or credit card and purchase

24 Bitcoin that way.

25          Another way will be to use a peer-to-peer exchange.

1  This is basically an exchange that brings buyers and sellers

2  of Bitcoin together.  An example of that would be

3  LocalBitcoins.  So it's basically a middle-man between the

4  buyer and the seller.

5       Or you can always do a direct transaction with

6  somebody.  So if I know somebody that wants to sell me

7  Bitcoin, I can go and pay them cash in-person or by credit

8  card and do it directly with that individual.

9  Q    You mentioned Coinbase as an example a centralized

10 exchange.  Can you give us other examples?

11 A    Sure.  Binance, is a popular one.  Kraken is a popular

12 one.  And on peer-to-peer, LocalBitcoins would be, or Paxful.

13 Q    If I wanted to buy Bitcoin on Coinbase, what would I do?

14 A    You would have to first create an account.  And then go

15 through identity verification process, like you would with a

16 regular bank.  Then you have to basically provide your

17 driver's license, social security number, date of birth, real

18 name, usually you also have to provide proof of address with

19 utility bill.  After that process, you would link your bank

20 account to your Coinbase account, then you're able to buy

21 crypto currency.

22 Q    Is any special equipment required to access Coinbase?

23 A    Just an Internet connection.

24 Q    Do commercial exchanges charge fees?

25 A    Yes, they do.

1   Q    How is the fee assessed?

2   A    The fee is generally set by the exchange.

3   Q    What was Coinbase's transaction fee in 2018?

4   A    In 2018 it was about 1.49 percent for bank transfers and

5   3.99 percent for credit card transactions.

6   Q    Are commercial exchanges regulated?

7   A    Yes, they are regulated.

8   Q    Who regulates them?

9   A    The Government in which they operate.  Generally it has

10  to do with where the customers are, if any of the customers

11  are in the United States, for example, then they would have to

12  abide by regulation set by the United States.

13  Q    Can Coinbase be used anonymously?

14  A    It would be very difficult, unless the individual stole

15  someone else's identity.  It would be very difficult to use it

16  anonymously.

17  Q    Why is that?

18  A    Because you have to go through a rigorous identity

19  verification process in order to transact on Coinbase.

20  Q    Turning to what you referred to as peer-to-peer

21  exchanges.  What does peer-to-peer mean?

22  A    It means that unlike Coinbase where you're actually

23  buying crypto currency from the exchange, you would be buying

24  on a peer-to-peer basis from another individual.  So a

25  peer-to-peer exchange would act as an arbitrator or a

1   middle-man between you and another individual that would like

2   to transact in crypto.

3   Q    Can peer-to-peer exchanges happen over the Internet?

4   A    Yes.

5   Q    Can they happen in person?

6   A    Yes, absolutely, they can also happen in person.

7   Q    How would that work?

8   A    Many times if you want to conduct a peer-to-peer

9   transaction, many times you would first go to a peer-to-peer

10  exchange, see who is actually selling or buying crypto.  Then

11  you would find a listing for whatever it is that you want to

12  buy.  And then the exchange would facilitate that transaction.

13          Many people will actually then go off of the

14  exchange and conduct subsequent deals directly with that

15  individual that they found on the exchange.  So that can be

16  either in person, so they can meet in-person.  I'll sell them

17  the Bitcoin, I'll send it to their wallet that they give me.

18  Then they'll give me cash in-person, or if they have a credit

19  card reader we can also do that, or bank transfer or wire

20  transfer as well.

21  Q    Special Agent Infante, are you familiar with the ways in

22  which individuals who conduct off-exchange peer-to-peer

23  transactions communicate?

24  A    Yes.  They usually communicate via messaging platforms or

25  apps such as Signal, Wickr, WhatsApp.

Infante - direct - Diouf                    222

1  Q     What is Signal?

2  A     Signal is an encrypted messaging app that is used to

3  communicate.  It uses end-to-end encryption, which means that

4  the individuals that operate Signal can't see the content of

5  the messages that are being transmitted.

6  Q     And how would I use Signal?

7  A     You would have to download it to your phone, and it's

8  fairly simple.

9  Q     What is Telegram?

10  A     Telegram is also a similar app that allows peer-to-peer

11  communication.

12  Q     Do peer-to-peer exchanges charge transaction fees?

13  A     Yes, they do.

14  Q     In general, how do those fees compare as commercial

15  exchanges like Coinbase?

16  A     Usually the fees are, the fee itself set by the

17  peer-to-peer exchange are similar.  But the spread or the

18  price of the actual asset is higher, so it actually may be

19  more expensive for you to transact on a peer-to-peer exchange

20  than it would be on a centralized exchange such as Coinbase.

21  Q     Why would someone use a peer-to-peer exchange over a

22  commercial exchange if it's more expensive?

23  A     One reason would be avoid having to provide identifying

24  information.  So, many peer-to-peer exchanges don't require

25  identifying information to be provided, especially if they are

1   located in other countries that don't have those regulations.

2   So that would be, I think, one of the main reasons that

3   somebody wouldn't want to use, for example Coinbase, and have

4   to pay more money to use a peer-to-peer exchange.

5   Q    In your experience, can you buy illegal drugs online?

6   A    Yes.

7   Q    How are they paid for?

8   A    Usually the most common way would be in crypto currency.

9   Q    If I'm an online drug dealer and I have crypto currency

10  that comes from drug sales, how I would change it into cash?

11  A    Many times you would use either brokers that you already

12  know, so in a peer-to-peer manner.  Or if you don't know any

13  brokers that would exchange your crypto currency for cash, you

14  could use one of those peer-to-peer exchanges that will

15  connect you with other individuals that are buying crypto.

16  Q    In your experience, have you investigated peer-to-peer

17  exchanges?

18  A    I have, yes.

19  Q    And are you familiar with the types of crimes that might

20  occur on peer-to-peer exchanges?

21  A    Yes.

22  Q    What are those?

23  A    Generally money laundering, money laundering of crypto

24  currencies that spring from different types of crimes, such as

25  the sales of drugs online, for example.

Infante - direct - Diouf                    224

1   Q    You mentioned LocalBitcoins.com earlier what is that?

2   A    LocalBitcoins.com is an example of a peer-to-peer crypto

3   currency exchange.

4   Q    Is LocalBitcoins.com still operating?

5   A    Yes, it is.

6   Q    Was it operating in 2018?

7   A    Yes.

8   Q    Have you worked on any investigations involving

9   LocalBitcoins.com?

10  A    Yes, on multiple occasions.

11  Q    What sorts of investigations were these?

12       MR. SINGER:  Objection, your Honor.

13       THE COURT:  Overruled.

14  Q    You can answer.

15  A    Usually they were money laundering and drug trafficking

16  investigations involving crypto currencies.

17  Q    Where is LocalBitcoins.com based?

18  A    In Finland.

19  Q    And in 2018 if someone wanted to use LocalBitcoins.com,

20  what would they do?

21  A    They would have to create an account with a username and

22  password, usually they wouldn't have to provide a name or any

23  kind of identifying information, and they could trade crypto

24  currency without having to provide identity basically.

25       MS. DIOUF:  Just a moment, your Honor.

1          Nothing further.  Thank you.

2          THE COURT:  How are we doing?  Could we start

3   cross-examination without a break?  Okay.

4          Let's go, Mr. Singer.

5   CROSS-EXAMINATION

6   BY MR. SINGER:

7   Q    Good afternoon, Special Agent Infante.

8   A    Good afternoon.

9   Q    We have not met before, correct?

10  A    That's correct.

11  Q    It's a pleasure to meet you.

12  A    Likewise.

13  Q    You described digital currency as a means of exchange; is

14  that right?

15  A    That's correct.

16  Q    I just find it easier to refer to it as Bitcoin.  Is it

17  okay if I just speak of it as Bitcoin, understanding that

18  we're speaking generally about digital currency, okay?

19  A    Sure.

20  Q    So digital currency is a form of property, it's not money

21  like it's a 20-dollar bill, right?

22  A    It could be considered money.

23  Q    It's used like money.

24  A    It is used like money, yes.

25  Q    Okay.  And but essentially it's a form of property that

1  exists in a digital form on the blockchain, correct?

2  A    It could be considered as property, yes.

3  Q    The U.S. Treasury Department doesn't consider it currency

4  like U.S. currency for tax purposes, does it?

5  A    I'm not sure.  I'm not a tax expert, so I'm not sure for

6  taxes.

7  Q    You indicated that any digital currency the value is

8  determined by the market?

9  A    Yes.

10  Q    And it's determined, therefore, by just what somebody

11  will pay for it, correct?

12  A    Yes.

13  Q    And so the fluctuations in the value of a Bitcoin can

14  change significantly over time, right?

15  A    That's correct.

16  Q    I think you indicated that today one Bitcoin is worth

17  approximately $19,000?

18  A    Yes.

19  Q    And you said four years ago in 2018, that a Bitcoin was

20  worth an average of about $6,000?

21  A    That's correct.

22  Q    Maybe a little below, maybe a little above, but in that

23  general range, correct?

24  A    Correct.

25  Q    The value of Bitcoin, in your experience, has been known

Infante - cross - Singer                              227

1  to vary quickly and wildly?

2  A    Yes.

3  Q    That would be fair to say, correct?

4  A    Yes.

5  Q    You talked about different ways that a person may acquire

6  a Bitcoin -- let me step back for a second.

7         When a person -- Bitcoin can be owned in fractional

8  units as well, correct?

9  A    Yes.

10 Q    So you don't own one or two or three Bitcoins, you can

11 own 1.276 Bitcoin, correct?

12 A    Yes, correct.

13 Q    So it's actually broken down by, I'm not sure by how

14 many, but past a number of decimal points?

15 A    Correct.

16 Q    The market value is simply the value of one Bitcoin, then

17 you have to calculate the value to get to the fractional part,

18 correct?

19 A    Yes.

20 Q    You said that a Bitcoin can be purchased in several ways.

21 You indicated a person can go to an exchange and buy Bitcoin,

22 correct?

23 A    Yes.

24 Q    That was the Coinbase?

25 A    Right.

Infante - cross - Singer                    228

1   Q    And again, Coinbase operates like a bank.  It's a company

2   that operates like a bank where you have an account with them?

3   A    Yes.

4   Q    It's more of an electronic bank that operates only with

5   digital currencies?

6   A    Yes.

7   Q    There isn't a Coinbase branch on my corner where I can

8   get a passbook and put some savings in, right?

9   A    Right.

10  Q    Showing my age with a passbook reference.

11        You said a person can also obtain Bitcoin through a

12  peer-to-peer transaction, correct?

13  A    Right.

14  Q    Or through a direct transaction with an individual?

15  A    Right.

16  Q    Peer-to-peer, if it's LocalBitcoins.com or some other

17  peer-to-peer exchange, essentially acts as a way of

18  introducing people to each other?

19  A    Right.

20  Q    Like Craigslist.  If you have a sofa you want to sell,

21  you can advertise it on Craigslist and someone will find it

22  and say, yes, I'm interested in buying it and it puts people

23  together, correct?

24  A    Very similar, but LocalBitcoins also has an escrow system

25  as well.

1    Q    It's more sophisticated for digital currencies, but it's

2    the manner in which people are put together, right?

3    A    Right.

4    Q    There is another way that individuals can obtain Bitcoin

5    and that's referred to as mining; is that right?

6    A    Yes.

7    Q    You're familiar with mining Bitcoin?

8    A    Yes.

9    Q    I'll try to put my question to you, then you can correct

10   me.  Okay?  The mining, what is referred to as mining of

11   Bitcoin, is essentially a very complicated series of

12   mathematical equations that are done by computer; is that

13   fair?

14   A    Yes.

15   Q    Okay.  The computer equipment can be expensive to obtain,

16   correct?

17   A    Correct.

18   Q    And they are known to take or use enormous amounts of

19   electricity, correct?

20   A    Yes.

21   Q    Because of the number of transactions, the amount of data

22   that is going through the computer, and the amount of time

23   that it takes, all of those things are using large amounts of

24   electricity, correct?

25   A    Yes.

Infante - cross - Singer                    230

1  Q    A person who is successful -- is mining considered a

2  difficult way of obtaining Bitcoin?

3  A    Very difficult.  And for a regular person, probably

4  almost impossible nowadays.

5  Q    Nowadays?

6  A    Right.

7  Q    You said that Bitcoin was first created in 2009?

8  A    Yes.

9  Q    And so in the early years of the existence of Bitcoin,

10 would it be fair to say that mining was -- there was more

11 activity in mining because of a greater opportunity to

12 actually obtain Bitcoin that way?

13 A    I wouldn't say more activity.  But there may have been

14 more opportunity for an individual with a regular computer to

15 be able to mine, yes.

16 Q    Would you say that in 2018 it would have been easier to

17 mine than it is today?

18 A    Not really, no.  2018 would probably be similar

19 difficulty.

20 Q    Are you familiar with a company called Bitmain?

21 A    Yes.

22 Q    Bitmain is a Chinese company?

23 A    Yes.

24 Q    A company that exists in China?

25 A    I'm not sure if they still do.  I think they may have

Infante - cross - Singer                    231

1   left China recently.

2   Q    Recently.  Back in 2018, 2019 Bitmain was a Chinese

3   company, yes?

4   A    Yes.

5   Q    Bitmain manufactured machines that individuals could buy

6   that are called mining machines; is that right?

7   A    Right.

8   Q    An individual who wanted to buy a mining machine, do you

9   recall approximately how much that costs back then, 2018?

10  A    No, I can't recall.  There is also different tiers of

11  them, depending on the structure of the machine.

12  Q    So different types of machines depends on their size,

13  sophistication, whatever it might be with varying costs?

14  A    Yes.

15  Q    But any individual, as far as you understand, could go to

16  Bitmain's website and purchase one or multiple machines if

17  they were available; is that correct?

18  A    I'm not sure if Bitmain had a way of purchasing through

19  their website; but I do know that Bitmain machines could be

20  purchased, yes.

21  Q    If I were able to purchase a Bitmain mining machine here

22  in New York, I would purchase it from Bitmain and they would

23  ship it to me, correct?

24  A    I really can't -- I really don't know if Bitmain would

25  ship it or it would have to be a third-party to ship it.  But

Infante - cross - Singer                    232

1   you can obtain a mining machine, yes.

2   Q     Obtaining a mining machine from Bitmain, or any other

3   company that would make them, is and was legal in the United

4   States, correct?

5   A     Yes.

6   Q     Once I obtain a mining machine, I could resell it to

7   somebody else, correct?

8   A     Sure.

9   Q     If I were to purchase a machine from Bitmain, have it

10  sent either directly or through a third-party to me here in

11  New York, I could then advertise that on any kind of website

12  if someone wanted to purchase it, I could sell it to them?

13  A     Sure.

14  Q     That would be legal, correct?

15  A     Yes.

16  Q     Not illegal in the United States and it wasn't in 2018 to

17  buy, or sell, or resell a mining machine; is that correct?

18  A     That's correct.

19  Q     You've indicated some reasons why a person may seek to

20  use a peer-to-peer exchange or a direct meeting, personal

21  meeting, with a person to exchange Bitcoin, any digital

22  currency but here Bitcoin, for cash; is that correct?

23  A     Yes.

24  Q     One of them, I think you indicated was perhaps the most

25  common reason, was essentially to have some privacy in the

1    transaction; is that fair to say?

2    A    Sure, yes.

3    Q    A peer-to-peer exchange is legal in the United States?

4    A    It's depends.  As long as -- it depends on the quantity

5    of the exchanges and how the exchanges are being operated.  So

6    in some instances you would need a license to operate an

7    exchange; without a license it would be illegal.

8    Q    The peer-to-peer exchange would need a license or the

9    individuals using the peer-to-peer exchange?

10   A    Both.  In some instances both would need a license.

11   Q    You referenced specifically LocalBitcoins.com?

12   A    Yes.

13   Q    You said that is a company that is based in Finland?

14   A    Yes.

15   Q    And that it's on the Internet so it's accessible here in

16   the United States, correct?

17   A    Yes.

18   Q    LocalBitcoins was a place where individuals could go to

19   advertise either I want to buy or sell Bitcoin or any other

20   digital exchange, right?

21   A    Yes.

22   Q    Digital currency, I'm sorry.  In 2018 it existed and was

23   legal?

24   A    Yes.  It was legal, yes.  As long as licenses were

25   obtained where they are needed.

1   Q    LocalBitcoins.com is still in business, isn't it?

2   A    It is, yes.

3   Q    It's still accessible on the Internet?

4   A    It is.

5   █ ████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   █  ██████████████████████████████████████████████

8          ████████████   █████████   ████████████

9   Q    But it still exists?

10  A    It still exists, yes.

11  Q    If I want go onto LocalBitcoins and find somebody who is

12  selling Bitcoin and I want to buy some Bitcoin, I can arrange

13  through LocalBitcoins to meet with them and do the exchange?

14          MS. DIOUF:  Objection, your Honor.

15          THE COURT:  Overruled.

16  BY MR. SINGER:

17  Q    I can give them a credit card or cash or wire them money

18  and they can transmit the Bitcoin to me, correct?

19  A    So as far as I know, nowadays they don't do in-person

20  meetings any more.  But you can use bank transfers, credit

21  cards, and PayPal, things like that.

22  Q    If you find a person -- I think you indicated these

23  personal exchange, not peer-to-peer but direct transaction

24  within an individual, if I find an individual or I know an

25  individual that has Bitcoin and I want to purchase it for

1  cash, I can meet with that person and do the exchange,

2  correct?

3  A    Yes.

4  Q    And that's legal, is it not?

5  A    It depends.

6  Q    It's standing alone.  Obviously, if I'm doing it for some

7  illegal purpose it might not be.  But the exchange itself, of

8  cash for Bitcoin, is legal, is it not?                .

9  A    It depends.

10 Q    It depends.

11 A    Yes.

12 Q    Okay.  Well --

13 A    If you're doing it that one time, then it would be legal,

14 yes.  But if you're doing it continuously without a license,

15 it wouldn't be legal.

16 Q    That is your understanding of the law, correct?

17 A    If you're acting as a money transmitter, which is

18 continuously doing exchanges back and forth, then you're

19 acting as a money transmitter and you would have to get a

20 license.  If you're doing without a license --

21 Q    If you're accepting money for a fee and transmitting it,

22 then you might be a money transmitter, correct?

23 A    Sure.

24 Q    If I do an exchange, an individual exchange like that, it

25 may take 15, 20 minutes, half hour, an hour for the blockchain

Infante - cross - Singer                           236

1   to complete its work.  But if I meet with someone and pay cash

2   for Bitcoin, that transaction is complete in that meeting; is

3   that correct?

4   A     It depends if you're using LocalBitcoins as an escrow

5   service.

6   Q     Let's keep LocalBitcoins out of it.

7         If I'm doing an individual exchange.  I have

8   Mycelium wallet on my phone, and I meet with someone.  I meet

9   with you and you have a Mycelium wallet with Bitcoin on your

10  phone.  I give you X dollars in exchange for a certain amount

11  of Bitcoin.  I give you the money, you've got the cash, you

12  transfer the Bitcoin to my wallet and the exchange is done; is

13  that right?

14  A     Yes.

15  Q     Nothing else that needs to be done?

16  A     Right.

17  Q     It can be completed within that meeting that we have?

18  A     Yes.

19  Q     You indicated Coinbase, again, as an example of one of

20  the commercial exchanges that exists?

21  A     Right.

22  Q     And you said that it was quick and easy, I think you

23  referenced; is that right?  I hear you correctly that using

24  Coinbase could be quick and easy?

25  A     It would be cheaper than using a peer-to-peer exchange.

1   Q    Cheaper?

2   A    Yes.

3   Q    Quicker?

4   A    Maybe, sometimes, it depends.

5   Q    So if I have Bitcoin and I want to sell it and get cash

6   for it so I can make use of that cash quickly, I would set up

7   an account with -- I wanted to use the commercial exchange --

8   I would set up an account with Coinbase, correct?

9   A    Sure.

10  Q    And whatever time period that might be, if it's a matter

11  of hours or days for the various verifications to take place,

12  then I have a Coinbase account, right?

13  A    Yes.

14  Q    Then if I say, for instance, that what I'm linking to my

15  Bitcoin account with Coinbase is my checking account?

16  A    Yes.

17  Q    Regular commercial bank.

18  A    Yes.   .

19  Q    Citibank, Chase, whatever it is.  I go on Coinbase and I

20  indicate I want to exchange 1.5 Bitcoin for whatever the

21  market value is that day.  Okay.  $30,000?

22  A    Sure.

23  Q    How soon is that $30,000 going to be in my bank account?

24  A matter of days, isn't it?

25  A    It could be, yes.

Infante - cross - Singer                          238

1   Q     It's the electronic transfer system that commercial banks

2   use to transmit money; is that correct?

3   A     Right.   And they could also use wire transfers, which

4   could be faster, and credit card transaction would be

5   immediate as well.

6           (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rivka Teich

Infante - cross - Singer                    239

1    BY MR. SINGER: (Continuing.)

2    Q    I'm talking about cash because if it's on a credit card

3    and I need the cash for something, I'm still slowed up because

4    I don't have the cash available to me.  If I'm going to do the

5    exchange and put it in my bank account so I can withdraw cash,

6    I can go to a teller and withdraw the cash from the bank

7    account, that may take several days if I use Coinbase; is that

8    fair to say?

9    A    It's possible, yes.

10   Q    And, so, a peer-to-peer or a direct meeting with an

11   individual may be quicker than that?

12   A    It may be, yes.

13   Q    Okay.  And might I pay a premium to do it quicker, pay a

14   little more?

15   A    Maybe.

16   Q    I might?

17   A    Maybe, yes.

18   Q    Okay.  Now, you've -- as part of your training and

19   experience and I guess work, you attend various conventions

20   related to cryptocurrencies?

21   A    Yes.

22   Q    In the U.S. or around the world?

23   A    Yes.

24   Q    Let's keep it in the United States.  Now, have you been

25   to any conventions in, say, the last year?

1  A    Yes, I have.

2  Q    Now, sometimes as a speaker, sometimes simply to observe

3  and go to different talks about things?

4  A    Yes.

5  Q    And perhaps as part of your work and I'm not asking you

6  any questions about that, okay?

7            Have you seen at any of these conventions what I

8  guess could be called an ATM for Bitcoin?

9  A    I can't recall.

10  Q    Are you familiar with ATMs, special machines that appear

11  and operate like a regular ATM, but that's used for Bitcoin?

12  A    I am familiar with an ATM, but I can't recall if I ever

13  saw one at conference or a convention.

14  Q    Have you seen one out on the streets in Miami or New

15  York?

16  A    I have, yes.

17  Q    And they look like a regular ATM, correct, approximately

18  the same size?

19  A    You're.

20  Q    And have you ever used one of them, just to see what they

21  are and how they operate?

22  A    Yes, I have.

23  Q    And the way you use one of those Bitcoin ATMs and it may

24  be for other digital currencies, but I'm using Bitcoin

25  generically, okay?

1  A    Sure.

2  Q    The way you would use those ATMs is I would open whatever

3  I have on my phone and put it up to a screen and it would read

4  my code.  Is that right?

5  A    Depending on what kind of transaction you would like to

6  effectuate, if it's a buy or a sell.

7  Q    If I want to sell Bitcoin at one of those machines and

8  get cash for it, how would I do that?

9  A    The machine will usually give you a Bitcoin wallet to

10 send the Bitcoin to and then you would use your -- if it's

11 Mycelium, if it's Mycelium, you would use Mycelium Wallet to

12 send the currency to -- the cryptocurrency to the machine and

13 then the machine would give you cash.

14 Q    And are those becoming more prevalent in your experience,

15 the existence of Bitcoin ATMs?

16 A    They're becoming more prevalent in terms of quantity.

17 There's more of them.

18 Q    And are they legal?

19 A    If they are operating with a license, then, yes, they're

20 legal.

21 Q    That's a suit.  If you're doing things properly with

22 whatever licenses, whatever are needed, the ability to use it

23 is legal, it's not illegal in all circumstances; right?

24 A    Sure.

25 Q    Okay.  And --

Infante - cross - Singer                    242

1   A    As long as you're not exchanging, as long as your

2   cryptocurrency is not from illicit proceeds, yes it's legal.

3   Q    Do the ATMs charge fees?

4   A    Yes.

5   Q    And are you familiar with the approximate fees that are

6   charged by these machines?

7   A    It can be anywhere from two to 10 percent.

8   Q    To 10 percent, even more in some instances?

9   A    Could be, yes.

10  Q    And these are available for people to use because it's --

11  well, withdrawn.

12          So, individuals may be using these machines and

13  paying as much as 10 percent to exchange their Bitcoin for

14  cash.

15  A    Yes, sometimes, yes.

16          MR. SINGER:  Judge, can I have one minute, please?

17          THE COURT:  Yes, you may.

18          (Pause in proceedings.)

19          MR. SINGER:  I'm sorry, just one or a few brief

20  questions to follow up.

21  BY MR. SINGER:

22  Q    When I go to a regular commercial bank Citibank, Chase,

23  whatever, the money that I have in that bank is insured by the

24  FDIC?

25  A    Yes.

SN        OCR        RPR

Infante - cross - Singer                243

1  Q     So the FDIC is a government agency that insures up to a

2  certain limit the money that I have in the bank so that in

3  case the bank goes under its protection for the deposit; is

4  that right?

5  A     Yes.

6  Q     To your knowledge are the commercial exchanges like

7  Coinbase and other similar commercial exchanges, are they

8  insured by the federal government?

9  A     To my knowledge, no.

10        MR. SINGER:  Thank you, very much.  I have nothing

11  else.

12        THE COURT:  Thank you, Mr. Singer.

13        Any redirect?

14        MS. DIOUF:  No redirect, Your Honor.

15        (Witness excused.)

16

17

18

19

20

21

22

23

24

25



SN        OCR        RPR



Infante - cross - Singer                                    245

1   ████████████████████████████████████████████

2   ████████████████████████████████████████

3   ██████████    ███████████████████████████

4   ████████████████████████████████████████

5   █████████

6           ████████████    ████████████████

7           The Government calls Mr. Patrick O'Kain to the

8   stand.

9           THE COURT:  Okay.  Let's have Agent O'Kain up here.

10          (Witness takes the stand.)

11          THE COURT:  Remain standing for one moment so you

12  can be sworn in.

13          THE COURTROOM DEPUTY:  Raise your right hand.

14          (Witness sworn/affirmed.)

15          THE COURTROOM DEPUTY:  Have a seat.  Please state

16  and spell your name for the record.

17          THE WITNESS:  Patrick O'Kain, P-A-T-R-I-C-K

18  O-'-K-A-I-N.

19          (Continued on the next page.)

20

21

22

23

24

25

1  PATRICK O'KAIN,

2          having been first duly sworn, was examined and

3          testified as follows:

4  DIRECT EXAMINATION

5  BY MS. KASSNER:

6  Q    Good afternoon, Mr. O'Kain.

7  A    Good afternoon.

8  Q    Mr. O'Kain, if you could remove your mask, please.  Thank

9  you.

10         From approximately September 2012 through January

11  2021, what were you doing for a living?

12  A    I worked as a special agent for the Drug Enforcement

13  Administration.

14  Q    Is the Drug Enforcement Administration also known as the

15  DEA?

16  A    That's correct.

17  Q    What does a special agent at the DEA do?

18  A    We're responsible for investigating drug crimes and money

19  laundering crimes surrounding drug dealing.

20  Q    Can you tell us a little bit about your educational and

21  professional background from before you joined the DEA?

22  A    I got my undergraduate degree at a school called Mercy

23  Hurst University.  I majored in intelligence studies.  After I

24  graduate dead from Mercy Hurst I went to work in the

25  intelligence field.  So I went to work for a few different

1   companies that were responsible for working with the

2   Government in the United States intelligence community.

3   Q    While you were working at the DEA were you assigned to

4   work at any particular offices?

5   A    Yes, I started at the DEA in California in San Francisco.

6   I worked there for several years and then I transferred to the

7   New York division.  And in the New York division I worked in

8   various enforcement groups and that's the -- an enforcement

9   group is what they -- the DEA calls a team of agents that

10  investigates crimes.  And I also worked with New York's cyber

11  division as well.

12  Q    And were you working with New York's cyber division or

13  working on cyber cases in July 2018?

14  A    Yes, I was working on cyber-related cases.  I cannot

15  recall exactly when we started up the cyber unit, but I was

16  working cyber investigations and at some point we created the

17  officially designated cyber unit.

18  Q    And while you were in the cyber unit did you ever work on

19  investigations involving cryptocurrency?

20  A    I did, yes.

21  Q    What is cryptocurrency?

22  A    Cryptocurrency, also known as digital currency, is

23  essentially an all-online currency.  There's no physical form

24  and it's -- the currency is essentially computer code that is

25  transferred to -- from one individual to another or one entity

1  to another on what is called the block chain.  And the block

2  chain is essentially an online accounting ledger that keeps

3  track of all of the transactions with a specific

4  cryptocurrency.

5  Q    And did you work on any investigations involving Bitcoin?

6  A    Yes.

7  Q    What is Bitcoin?

8  A    Bitcoin is a type of cryptocurrency or digital currency.

9  Q    Is the use of Bitcoin illegal in the United States?

10  A    No.

11  Q    Is it always legal or always illegal?

12  A    Well, I think it depends but it's generally legal.

13  Q    And while at the DEA did you work -- what was the nature

14  of your investigations that involved Bitcoin?

15            MR. SINGER:  Objection, Your Honor.  Relevance.

16            THE COURT:  Overruled?

17            PROSPECTIVE JUROR:  We would investigate Bitcoin as

18  it pertained to suspected money laundering involving drug

19  crimes.

20  Q    While at the DEA did you ever work undercover?

21  A    I did.

22  Q    In general terms, what does it mean to work undercover?

23  A    When an agent is working undercover they essentially

24  assume a different persona that is not a special agent for the

25  Government and the purpose of that is to investigate suspected

1  crimes and, you know, there's a lot of different types of

2  undercover operations but generally speaking you play a role

3  and you investigate a crime as an agent, but you're not

4  letting the target of the investigation or the suspect know

5  that you're with the Government.

6  Q    And, generally speaking, when you're working undercover,

7  do you wear any particular clothing or do anything differently

8  than you otherwise normally would?

9  A    I think you generally try to dress and act and speak the

10  part of the role that you're trying to play.  So that could

11  mean anything.  If you just try to play the part that you

12  think would best fit the role that you're trying to play, so

13  you dress in accordance to what you think.

14  Q    Breaking it down step-by-step can you please explain to

15  the jury from beginning to end what happens during a typical

16  undercover operation?

17          MR. SINGER:  Objection, Your Honor.  If it's not

18  related to his dealings with Mr. Goklu.  I don't know how it's

19  relevant.

20          THE COURT:  Overruled.

21  A    A typical undercover operation, you know, you start out

22  with the target of the investigation, the individual or entity

23  that you suspect is comitting the crime.  Then you start

24  communicating with that suspect in a certain capacity to set

25  up a meeting and then you also have a team of other agents or

1  law enforcement officers that you coordinate with internally

2  and -- so, let's say we're setting up an undercover meeting

3  with a suspect.  You would set up that meeting with the

4  suspect, you know, relatively when and where that's going to

5  take place, and then you coordinate with a team of Special

6  Agents and other law enforcement officers.

7         You have a team of surveillance agents that will be

8  available on the field to observe what's happening during that

9  undercover meeting and also to protect the undercover agent

10 that will be going out there.

11        Prior to the undercover meeting, the undercover

12 agent typically puts on various listening devices and then

13 goes out to meet the suspect and then you have your team out

14 there to make sure that everything is -- the conversation --

15 the undercover is protected.

16 Q    Are you familiar with an investigation into an individual

17 named Mustafa Goklu?

18 A    Yes, I am.

19 Q    Was what your role in that investigation?

20 A    I was the undercover agent.

21 Q    Do you see Mustafa Goklu in the courtroom today?

22        THE COURT:  You can stand up.

23        MS. KASSNER:  If it's possible for everyone at

24 defendant's able to remove masks.

25        THE COURT:  That is fine.  If you will all unmask so

1    we don't have any issue about --

2    BY MS. KASSNER:

3    Q    You mentioned that you could see Mustafa Goklu.  Can you

4    identify an item of clothing?

5    A    He's agent two from the left said with the red tie.  From

6    my orientation.

7              THE COURT:  All right.  And a red tie.  There are

8    two individuals with red ties.

9              THE WITNESS:  Brighter red tie and a full head of

10   gray hair.

11             MR. SINGER:  Judge, we stipulate he's indicating

12   Mr. Goklu.

13             THE COURT:  He is the third individual from the

14   left?

15             THE WITNESS:  Yeah, third.

16             THE COURT:  So the record is clear, the witness did

17   identify the defendant, Mr. Goklu.

18             Proceed.

19   BY MS. KASSNER:

20   Q    To your knowledge, did Mustafa Goklu go by any other

21   names?

22   A    Michael.

23   Q    Generally speaking, how did you first become familiar

24   with the defendant?

25   A    Become familiar?  The first time we met was during an

1  undercover operation, but I began communicating with him prior

2  to physically meeting him.

3              (Continued on the following page.)

O'Kain - direct - Kassner                253

1   BY MS. KASSNER:  (Continuing.)

2   Q     And why did you begin communicating with him?

3   A     We, I say we, so me and the co-case agent that was

4   working on this investigation, we identified a profile for an

5   individual that went by the street name Mustangy on a website

6   called localbitcoins.com.

7   Q     What is -- continue.

8   A     I think the question is, what is localbitcoins.com?

9   Localbitcoins.com was a website that matched up individuals

10  that wanted to buy cryptocurrency with individuals who wanted

11  to sell cryptocurrency.  So I guess it was sort of like an

12  eBay style website but for cryptocurrency.

13  Q     In your work as a DEA special agent, did you learn how

14  people can purchase Bitcoin?

15  A     Yes.

16  Q     Are you familiar with the term commercial exchange?

17  A     Yes.

18  Q     Can you give the jury an example of a commercial

19  exchange?

20  A     I think the most relevant, sort of, company would be

21  Coinbase.  So it's a licensed commercial financial institution

22  that exchanges various cryptocurrencies with one another or

23  cryptocurrencies with cash.

24  Q     And are commercial exchanges typically available on a

25  cellphone or laptop?

SG       OCR       RPR

1  A    Yes.

2  Q    And generally speaking, to use a commercial exchange, are

3  you required to provide any forms of identification?

4  A    To use a commercial exchange?

5  Q    Yes.

6  A    Yes.  So you have to provide typically a social security

7  number, address, usually a driver's license.

8  Q    Are you familiar with any other ways in addition to

9  commercial exchanges to purchase Bitcoin?

10 A    Yeah.  You can purchase through websites like

11 localbitcoins.com or directly with other individuals on a

12 peer-to-peer basis.

13 Q    And this peer-to-peer basis, does it typically involve a

14 physical exchange?

15 A    It can, yes.

16        So one thing localbitcoins.com facilitated was the

17 option for people that wanted to buy and sell Bitcoin to meet

18 up with the counter-party in person for a physical Bitcoin for

19 cash transactions.

20 Q    Now, you mentioned earlier that you first -- you're first

21 interaction with the defendant began after seeing a page on

22 localbitcoins.com.

23        Were why were you and other members of the DEA

24 looking into users of localbitcoins.com?

25 A    I remember -- I recall that we had information from other

1   non-related DEA investigations that website was used by

2   individuals to facilitate money laundering.  So that was one

3   reason we turned to localbitcoins.com.  And also, what we

4   noticed when we were looking through some of the

5   advertisements, they would -- the fees that individuals would

6   charge to make that transaction were significantly higher than

7   what you would have to do on commercial exchange.  And, you

8   know, it just didn't make sense why somebody would use --

9            MR. SINGER:  Objection, Your Honor, to this

10  speculative question.

11           THE COURT:  Overruled.

12           You're answer is complete.  Ask you're next

13  question.

14           MS. KASSNER:  If we could pull up just for the

15  witness what has been previously marked for identification as

16  Government's Exhibit 401.

17  A    I can see it.

18           THE COURT:  Yes.  The agent can see it.

19           MS. KASSNER:  Okay.

20  Q    Do you recognize Government's Exhibit 401?

21  A    Yes.  This is a screen capture of the defendant's

22  localbitcoins.com profile.

23  Q    And how do you recognize it?

24  A    I've seen it before.  I was there when it was captured.

25           MS. KASSNER:  At this time, the Government would

1    move to admit Exhibit 401 into evidence and publish it to the

2    jury.

3            (Government Exhibit 401, was received in evidence.)

4            THE COURT:  Any objection?

5            MR. SINGER:  No.

6            THE COURT:  Exhibit 401 is admitted and you may

7    publish.

8                    (Exhibit published.)

9    Q    When you were going through localbitcoins.com, what, if

10   anything, about the defendant's profile stood out to you?

11   A    Well, a couple of things.  So we were -- I was located in

12   the New York area.  So we were looking at people located in

13   New York, so that was one thing that stood out.  The other

14   thing that stood out at the time, from what I recall, was the

15   amounts that were listed that the defendant could exchange

16   were relatively high.  From what I recall, they were

17   significantly higher than some of the other advertisements

18   that we saw from the New York area.

19   Q    At the top of Government's Exhibit 401 it says, Mustangy.

20           What is Mustangy?

21   A    I believe that is the screen name that the defendant

22   chose to use for this website.

23   Q    When does the profile say that the account was created?

24   A    The account was created one year prior to when this

25   screen capture was created.

O'Kain - direct - Kassner                    257

1    Q    When was the first purchased?

2    A    Seven months and one week prior to the screen capture.

3    Q    And according to Government's Exhibit 401, when was the

4    last time the user Mustangy was last seen on the website?

5    A    23 hours and 21 minutes prior to the screen capture.

6    Q    Is there anywhere on the localbitcoins.com page that

7    lists Mustangy name or provides any identifying information

8    for him?

9    A    No.

10   Q    And is there anywhere on the localbitcoins.com page that

11   indicates whether or not Mustangy was licensed to transmit

12   money in the State of New York or the U.S. government?

13   A    No.

14   Q    At the bottom of the second page of Government's

15   Exhibit 401, there's a section that says, buy Bitcoins with

16   cash fromMustangy.

17        What do you understand the list that followed to

18   include?

19   A    I can't see the list that follows.

20        MS. KASSNER:   If we could turn to Page 3.

21   Q    Do you see the list at the very top of the page?

22   A    Yes.  So I understood each of those rows to be separate

23   listings for the defendant's ability to exchange

24   cryptocurrency for cash.  So at the very top you can see

25   Midtown New York, so that was the location that he was willing

1    to make the exchange.  I believe the 727,445.

2             THE COURT:  Hold on.  A little too fast.

3             727,445.  Go ahead.

4    A    Was the price of the Bitcoin at the time.  And then 100

5    to 20,000 USD was the range on the amounts that he was able to

6    transact.

7             MS. KASSNER:  And if we can focus on the list right

8    under that where it says, sell Bitcoins for cash to Mustangy.

9    And if we can blow that section up, please.

10   Q    So there's a similar list of rows here.  What do you

11   understand each row so correspond to?

12   A    Different like similar to the above.  Different listings

13   for the services that Mustangy could provide.  So the location

14   that he could operate in for that specific listing and then

15   the price of Bitcoin.  And then on the far right, it's the

16   limit of the amounts that he was able to transact at that

17   specific time.

18            THE COURT:  Can you pull the microphone closer to

19   you.

20            THE WITNESS:  Sorry.

21            THE COURT:  Keep you're voice up.

22   Q    So there's an entry here for Manhattan, New York.  How

23   much according to this page was the defendant -- what was his

24   limit to transact to sell Bitcoin for cash in Manhattan?

25   A    $9,999.

1    Q    And there are other locations that have higher amounts.

2         Which locations had the highest amount he was

3    willing to exchange?

4    A    Could we zoom out, please.

5         So Jersey City, New Jersey.  The listed amount is

6    $99,999.  And then in Sheepshead Bay, Brooklyn $99,999.

7    Q    And at the very bottom of the page, there's a section

8    that says feedback.

9         Can you read what it says under feedback?

10   A    Feedback left by users with noticeable trade volume on

11   May 24, 2018 at 12:52 a.m. It looks like a review was

12   submitted saying fast paying transaction.  Pleasure to do

13   business with.

14        MS. KASSNER:  And Your Honor, it is 5:29.  This

15   might be a good place to pause.

16        THE COURT:  Perfect.  So we'll do that.

17        Ladies and Gentlemen, we are going to stop for

18   today.  And I'll ask the witnesses to remain seated for a

19   moment.

20        Just a quick reminder, when you go home, don't talk

21   to anybody about the case.  Your experience here today other

22   than saying that you were picked for a jury.  You can say

23   that.  And don't do any research.  Don't post anything at all

24   about what's happening.  Keep an open mind.  And remember,

25   don't talk to each other about the case.

1        So have a good night, everybody.  We'll see you here
2   tomorrow morning ready to go by 9:30.  We'll break at 1:00
3   p.m. tomorrow.
4        Yes.
5        MS. KASSNER:  Your Honor, the binders.
6        THE COURT:  Please leave your binders on the chairs.
7   Remember to leave you're notes in the jury room.
8        Thank you, everyone.  Have a great night.
9        All rise.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



SG        OCR        RPR

1    ███████████        ████████████████
2    ███████████        ████████████████
3                *        *        *        *        *

5    (Matter adjourned until Tuesday, October 4, 2022, 9:30 a.m.)

SG        OCR        RPR

263

1                              I N D E X

2

3    <u>WITNESS</u>                                      <u>PAGE</u>

4

5      LILITA INFANTE

6          DIRECT EXAMINATION BY MS. DIOUF          208

7          CROSS-EXAMINATION BY MR. SINGER          225

8      PATRICK O'KAIN

9          DIRECT EXAMINATION BY MS. KASSNER        246

10

11   E X H I B I T S

12

13     Government Exhibit 401                        256

14

15

16

17

18

19

20

21

22

23

24

25

264

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,      : 19CR386(PKC)
4                                   :
             Plaintiff,             :
5                                   :
          -against-                : United States Courthouse
6                                   : Brooklyn, New York
MUSTAFA GOKLU,                      :
7                                   :
             Defendant.             : Tuesday, October 4, 2022
8                                   : 9:00 a.m.
                                    :
9                                   :
                                    :
10
- - - - - - - - - - - - - X
11
     TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
12            BEFORE THE HONORABLE PAMELA K. CHEN
               UNITED STATES DISTRICT JUDGE
13
                   A P P E A R A N C E S :
14
For the Government: UNITED STATES ATTORNEY'S OFFICE
15                      Eastern District of New York
                        271 Cadman Plaza East
16                      Brooklyn, New York 11201
                   BY:  GILLIAN KASSNER, ESQ.
17                      MARIETOU E. DIOUF, ESQ.
                        FRANCISCO NAVARRO, ESQ.
18                      Assistant United States Attorneys

19  For the Defendant:   MURRAY E. SINGER, ESQ.
                         14 Vanderventer Avenue, Suite 147
20                       Port Washington, New York 11050
                     SAHLI LAW PLLC
21                       195 Broadway, 4th Floor
                         New York, New York  11211
22                   BY:EMILEE SAHLI, ESQ.

23
Court Reporter:    SOPHIE NOLAN
24                    225 Cadman Plaza East/Brooklyn, NY 11201
                      NolanEDNY@aol.com
25  *Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription*





O'Kain - direct - Kassner                    267

1  ███████████     ███████████████     ██████████

2  ███████████████████████████████████████████

3  █████████████████████████████████████████

4  ████████████████████████████████████  ████████

5  ███████████████████████████████████████████

6  ████████████████████████████████████████████

7  ████████████████████████████

8     ██████████████████████████████████████████

9  ████████

10          (Witness resumes the stand.)

11          THE COURT:  Please have a seat.

12  **PATRICK O'KAIN**, having been previously duly sworn/affirmed,

13       testified as follows:

14  CONTINUED DIRECT EXAMINATION

15  BY MS. KASSNER:

16  Q    When we left off yesterday, you were explaining that you

17  saw the user Mustangy on LocalBitcoins.com; is that right?

18  A    Yes.

19  Q    After you discovered Mustangy on LocalBitcoins.com what

20  if anything did you do next?

21  A    Myself and the other special agent that was working the

22  case with me, started to communicate with Mustangy through an

23  application -- a telephone application called Signal.

24  Q    What is Signal?

25  A    Signal is an encrypted chat application for smartphones.

1   Q    And how is Signal different, if at all, from a regular

2   text message?

3   A    To the best of my knowledge, it is -- it just has

4   enhanced security and end-to-end encryption.  I recall that

5   they did not have any -- the company or the entity that runs

6   Signal did not keep any records.  So if the Government were to

7   subpoena them they wouldn't have any information to return.

8   Q    And I believe earlier you mentioned that you were working

9   with another special agent at the DEA; is that right?

10  A    That's correct.

11  Q    Who is that person?

12  A    Former Special Agent Allan Liefke.

13  Q    And is it fair to say that you were working together on

14  your investigation of Mustangy?

15  A    That's correct.

16  Q    At this point did you know Mustangy's true identity?

17  A    No.

18  Q    When you reached out to Mustangy on Signal were you

19  operating undercover?

20  A    Yes, I was.

21  Q    And in dealing with the defendant generally, did you

22  assume a cover story?

23  A    Yes.

24  Q    What was your cover story?

25  A    The cover story that I was operating under was that I was

1  an online drug dealer getting drug proceeds in the form of

2  Bitcoin that I needed to turn into cash.

3  Q    Why did you assume the role of a narcotics dealer selling

4  drugs or buying drugs on the internet as opposed to a

5  street-level dealer?

6  A    When you sell.  --

7            THE COURT:  We're going to pause for a moment --

8  thank you very much -- so that the young child could be

9  removed.

10           Start your answer again.

11 A    When individuals sell drugs online, typically they

12 receive payment in some form of cryptocurrency and not cash;

13 versus if somebody is selling drugs on the street, typically

14 the payment is received in cash.

15           MS. KASSNER:  Now, if we could please pull up just

16 for the witness what has been previously marked for

17 identification as Government Exhibits 501 through 507.

18 A    I can see it.

19 Q    It's a collection of exhibits.

20           (Exhibit published to witness only.)

21 Q    Do you recognize Government Exhibits 501 through 507?

22 And I believe we're going through each exhibit one by one.

23 A    That's correct.

24 Q    Do you recognize these exhibits?

25 A    I do.

O'Kain - direct - Kassner                270

1   Q    What are they?

2   A    These are photographs of the undercover phone that I was

3   using in the conversations with the defendant on the chat app

4   Signal.

5   Q    Are Government Exhibits 501 through 507 a fair and

6   accurate depictions of screenshots of all the messages you

7   exchanged with the defendant on Signal from July 28 -- sorry,

8   from July 2018 through April 2019?

9   A    I believe so, yes.

10              MS. KASSNER:  Your Honor, at this time the

11   Government would move to admit Government Exhibits 501 through

12   507 and public 501 for the jury.

13              THE COURT:  Any objection?

14              MR. SINGER:  No, Your Honor.

15              THE COURT:  501 through 507 are admitted and you may

16   publish them.

17              (Government Exhibits 501 through 507 received in

18   evidence.)

19              (Exhibit published.)

20   BY MS. KASSNER:

21   Q    So there are messages in light gray to the right.  Who

22   sent those messages?

23   A    I sent those messages.

24   Q    And there are messages in dark gray to the left.  Who

25   sent those messages?

SN        OCR        RPR

O'Kain - direct - Kassner                    271

1    A    The defendant.

2    Q    Beginning on July 11, 2018, can you read your messages

3    into the record from the top and I'll, in turn, read the

4    messages from the defendant?

5    A    "Hey, Mustangy want to sell about 10K BTC?  What's your

6    availability?

7    Q    I'll be Queens tomorrow.  What is your location?

8    A    Manhattan.  I'm out of town until next week though.  Just

9    didn't know how much advance notice you wanted.

10   Q    Text me when coming, mostly will cover.

11   A    Okay, thanks.

12   Q    You are welcome."

13           So, very briefly, what is BTC?

14   A    BTC is the shorthand for Bitcoin.

15   Q    What is 10K?

16   A    10K is 10,000.  So that is saying I want to sell $10,000

17   worth of Bitcoin.

18   Q    And at a high level what's going on in this back and

19   forth?

20   A    This is the beginning of setting up a meeting between

21   myself and the defendant to exchange $10,000 worth of Bitcoin

22   for cash.

23   Q    Turning to page two of Government Exhibit 501, beginning

24   on August 27, 2018 at 12:34 p.m. can you read your messages

25   and I'll read the defendant's messages?

SN          OCR          RPR

O'Kain - direct - Kassner                272

1  A    "Hi.  Are you still available?  I have to sell 5-K BTC
2  tomorrow.
3  Q    If sharp, I might be around midtown.  Let me know.
4  A    I can do midtown.  What time?  Are we good for tomorrow?
5  I'll be in midtown around 1."
6  Q    What does 5K mean here?
7  A    $5,000 worth of Bitcoin.
8  Q    Turning to page three, can you continue reading your
9  messages, beginning after Mustangy says:
10        "Yes after 8 a.m. to maybe noon, how much you want?
11  A    Okay.  Let's do noon.  Can you do just 5K tomorrow?
12  Q    Yes, okay.
13  A    Cool."
14  Q    And turning to page four, just jumping ahead.
15  A    Four?
16  Q    Yes.  On August 28th at 11:01 a.m. you write:
17        "Hello.  Are we still on for today?"
18        How does the defendant respond?
19  A    The defendant writes:
20        "Yes, I am at midtown, 55, 55 Street and Seventh."
21  Q    And skipping ahead to page eight?
22        THE COURT:  I think you said 11:01.  Didn't it say
23  10:01?  You didn't say that she said that.  I want to be sure
24  you're looking at the same messages.
25        MS. KASSNER:  Apologies, 10:01 a.m.  That's correct,

SN       OCR       RPR

1   Your Honor.

2           THE COURT:  Go ahead.

3   BY MS. KASSNER:

4   Q    And if we could skip ahead to page eight.  The defendant

5   writes at four -- it's hard -- the defendant writes on this

6   date:

7           "Can we meet at 54th and Seventh at 4:10 because I

8   have to be at London Hotel at 4:30.  Can you read your

9   messages?

10  A    Yeah.  Where do you want to meet?

11  Q    54th and Seventh Avenue northeast corner?

12  A    Heading there now.

13  Q    Okay.  Let me when here.

14  A    Here."

15  Q    What, if anything, happened after you wrote "here" at

16  4:16 p.m. on August 28, 2018?

17  A    So, at that time I was in a government unmarked vehicle

18  and when I wrote "here" I was in the area and I got out of the

19  vehicle across the street and met with the defendant at the

20  54th Street/Seventh Avenue location.

21  Q    Prior to that date had you ever encountered the defendant

22  in person?

23  A    No.

24          MS. KASSNER:  And if we could pull up just for the

25  witness Government Exhibit 302.  Do you recognize the area

1   shown in Government Exhibit 302?

2               (Exhibit published to witness only.)

3   A     Yes.

4   Q     What is that area?

5   A     This is an aerial image of Manhattan and the area in

6   which me and the defendant met.

7               MS. KASSNER:  At this time the Government would move

8   to admit Government Exhibit 302 into evidence and publish it.

9               THE COURT:  Any objection?

10              MR. SINGER:  No, Your Honor.

11              THE COURT:  All right.  Government Exhibit 302 is

12  admitted.

13              (Government Exhibit 302 received in evidence.)

14              THE COURT:  And you may publish.

15              (Exhibit published.)

16  BY MS. KASSNER:

17  Q     For the record, can you point out for the jury where you

18  met the defendant on August 28, 2018?

19  A     Right at the red dot.  I'm not sure the jury can see that

20  from there, but there's a red dot in the middle of the map

21  there.

22  Q     Are you generally familiar with the neighborhood around

23  54th Street and Seventh Avenue in Manhattan?

24  A     I am, yes.

25  Q     How would you describe that neighborhood?

1   A    It's very commercial, lots of highrises, busy, a lot of

2   shops on the street corners, a lot of people and this was

3   summertime so it was a sunny day.

4   Q    Were any other members of the DEA present on the day when

5   you met the defendant?

6   A    Yes.  There were several members of the DEA in the area.

7   Q    What were they doing?

8   A    They were on surveillance.  They were on the surveillance

9   team.  I kind of referenced that yesterday.  They were there

10  to observe the meeting and make sure that I was safe.

11  Q    Was your transaction with the defendant recorded?

12  A    It was recorded through audio.

13  Q    Why wasn't it recorded by video?

14  A    It's -- it was often challenging to record things through

15  video and when you're in an undercover capacity especially

16  you're not controlling the environment.  So oftentimes you

17  have to have some sort of camera on your person.  I already

18  had two cellphones and a listening device and this being the

19  first time that I was meeting the defendant, I had no idea who

20  he was and I didn't know if there was any safety concerns.  So

21  having more devices seemed outside of my comfort zone.

22          MS. KASSNER:  If I could just approach very briefly,

23  Your Honor?

24          THE COURT:  Yes, you may.

25          (Counsel approaches.)

1   BY MS. KASSNER:

2   Q    I just handed you a CD that's been marked Government

3   Exhibit 801 through 809.  Are you familiar with these

4   exhibits?

5   A    Yes.

6   Q    What are they?

7   A    These are audio recordings of the meetings that I had

8   with the defendant.

9   Q    How do you recognize them?

10  A    I listen to the CD and after confirming that the audio

11  recordings were on this disk, I signed it and dated it.

12          MS. KASSNER:  Your Honor, the Government would move

13  to admit Government Exhibits 801 through 809 into evidence.

14          THE COURT:  Any objection?

15          MR. SINGER:  No, Your Honor.

16          THE COURT:  Government Exhibits 801 through 809 are

17  admitted.

18          (Government Exhibits 801 through 809 received in

19  evidence.)

20          THE COURT:  And you may publish them to the jury.

21          (Exhibit published.)

22  BY MS. KASSNER:

23  Q    Okay.  Beginning with Government Exhibit 801, so,

24  everyone should that I have transcripts in the binders that

25  they have in front of them.  And, so, the transcripts are

1  going to be marked 801R which is where we're going to begin.

2  It's, I believe, the first tab in everyone's binders.

3        MR. SINGER:  Your Honor, could we explain to the

4  jury that R is simply a portion of --

5        THE COURT:  I thought I did that already, but --

6        MR. SINGER:  On the transcripts, not about the

7  recordings.

8        THE COURT:  All right.  I think the transcripts

9  reflect the edited recordings and furthermore, as I understand

10 it, the Government is only going to play a portion of the

11 entire recording.  Even as to the edited portion, I think the

12 Government is still playing a smaller portion of that edited

13 recording.  Obviously the parties and you will have available

14 to you the full recording, but for now the Government wants to

15 focus on certain portions.

16       Am I correct?

17       MS. KASSNER:  That's correct, Your Honor.  Thank

18 you.

19       THE COURT:  All right.

20       MS. KASSNER:  If we could play from timestamp 1:45

21 to timestamp 2:47.

22       (Audio played; audio paused.)

23 Q    How does the defendant introduce himself to you?

24 A    As Michael.

25 Q    How do you introduce yourself?

1  A    As Pat.

2  Q    Where are you during this portion of the conversation

3  with the defendant?

4  A    We are on the street corner, the northeast corner of 54th

5  and Seventh outside of a black Mercedes sedan.

6  Q    And at some point do you get into the car?

7  A    Yes.  After we introduce each other, we both get into the

8  car.

9  Q    You ask here -- you ask here, "Where is it" and then the

10  defendant responds "this one," and you respond "you got too

11  much of that lying around.  Is this it?"

12        What are you and the defendant talking about here?

13  A    So, when I got into the vehicle, the defendant opened the

14  center console and inside of the console there were multiple

15  bundles of cash.  And that discussion is me trying to identify

16  which one is destined for me and so I picked up one and the

17  defendant said that that's not the right one so I went to

18  another one and he said that wasn't it either and then

19  identified the right one for me.

20  Q    The defendant instructs you -- the defendant says, "Close

21  the door, man.  We're not drug dealers.  We're buying

22  Bitcoin."

23        What did you understand that to mean?

24        MR. SINGER:  Objection, Your Honor.  It's irrelevant

25  to what he believed.

1    THE COURT:  Overruled.

2  A    I opened the door because I didn't know who the defendant

3  was and if there were any safety concerns.  Then the defendant

4  asked me to close the door and said, close the door, man, the

5  cops, we're not drug dealers.  We're buying Bitcoin.  So I

6  think what was interesting to me --

7         MR. SINGER:  Objection, what was interesting, Judge.

8         THE COURT:  Overruled, overruled.

9  A    -- was that on our first encounter the defendant was

10 concerned about being identified by the cops.  That stood out

11 as something notable, something that was notable to me at the

12 time.

13        MS. KASSNER:  If we could play from 2:47 to 3:23.

14        (Audio played/audio paused.)

15 Q    The defendant here says, "If it too much, I have

16 machine."  What did you understand that to mean?

17 A    I understood the machine to be a reference to the money

18 counter.

19 Q    And what is going on during this section of the

20 recording?

21 A    I recall that we're getting ready to count the currency

22 or in the early stages of counting the currency from the

23 bundle of cash that we were going to transact with.

24        MS. KASSNER:  Moving ahead, if we could play from

25 4:30 to 5:35.

1          (Audio played/audio paused.)

2   Q    What are you and the defendant discussing here?

3   A    So, initially, again, so we're starting to coordinate how

4   much Bitcoin for cash the -- we're going to exchange, less the

5   fees that the defendant was charging.  So, when the -- I asked

6   the defendant what do you charge and he said 8, and 8 was a

7   reference to the percent of the total transaction that he was

8   charging for the service that he was providing.

9   Q    You respond, "You charge at 8 percent, all right.  That's

10  high."  Why did you say that?

11  A    A couple of reasons.  One, 8 percent is quite high --

12         MR. SINGER:  Judge, I object to this.  Again,

13  relevance.  His thinking not relevant.

14         THE COURT:  Overruled.

15  A    8 percent is quite high considering you can go to a

16  commercial exchange for significantly less, most often under 2

17  percent and then also in my experience doing undercover work,

18  it's very rare that there's not a negotiation of the fees.

19  Q    Can you explain to the jury how you actually transferred

20  your Bitcoin to the defendant?

21  A    Sure.  In this instance and often if you're doing a

22  peer-to-peer Bitcoin transaction, you have an application on

23  your cellphone, a cryptocurrency wallet.  When you want to

24  send cryptocurrency to somebody else, you can use a QR code.

25  You can scan a QR code.  A QR code are those little square

1   codes often found on restaurant tables now for menus.

2          So I would open up my cryptocurrency wallet.  The

3   defendant would open up his cryptocurrency wallet and his QR

4   code.  I would pull up the amount I wanted to send to this to

5   his QR code and that would populate the recipient's address in

6   my phone.  I would hit Bitcoin send and that would to his

7   Bitcoin address through the block chain.

8          MS. KASSNER:  If we could play from 8:30 to 9:33.

9          (Audio played/audio paused.)

10  Q    At the very beginning of this segment, when you ask, "How

11  much can you do at one time," the defendant answers "50."

12  What did you understand 50 to mean?

13  A    50,000.

14  Q    And then the defendant later says -- you asked, "Are you

15  in Manhattan here," and the defendant says, "I don't want to

16  come here.  You know these fucking malls all have the

17  cameras."  And then he says, "That's the other one -- that's

18  the other one that has cameras 2, 3, 5.  They call me, hey,

19  are you a drug dealer, no."

20          What did you understand that to mean?

21  A    I understood that the defendant was concerned about the

22  cameras seeing what he was doing and I interpreted that that

23  he was aware that there was something not aboveboard that he

24  was doing --

25          MR. SINGER:  Objection, Judge.  Again, he's not in a

1   position --

2          THE COURT:  Overruled, overruled.  Mr. Singer,

3   overruled.

4   A    And he indicated that they had called him before so that

5   indicated to me that this was not the first time that he's

6   done a transaction like this.

7   Q    And later the defendant says, "But it's Manhattan but I

8   bring the machine.  It's another risk, the machine."  And then

9   later he says, "The fucking thing is evidence that you're a

10  drug dealer."

11         What did you understand him to be talking about

12  here?

13  A    I understood that he was referencing the money counter

14  again and then him -- the possibility of him being caught with

15  the money counter by law enforcement -- they would assume he

16  was a drug dealer if law enforcement saw him driving around

17  with a money counter in his car.

18         MS. KASSNER:  If we could play from timestamp from

19  9:43 to 10:12.

20         (Audio played/audio paused.)

21  Q    You asked for a bag here.  What did you do that?

22  A    I wanted somewhere where I could put the bundles of money

23  he gave to me after the transaction because I had to walk

24  through Manhattan back to the undercover -- well, the agent

25  that was going to pick me up and take me out of the area and I

1  didn't want to walk around with just a bunch of cash

2  throughout Manhattan.

3          MS. KASSNER:  If we could play from 10:57 to 11:23.

4          (Audio played/audio paused.)

5  Q    The defendant here talks about making sure, using the

6  machine -- "So I make sure because I'm getting -- I'm getting

7  money from somewhere, something bad.  Who knows."

8          What did you understand that to mean?

9          MR. SINGER:  Can I have a continuing objection?

10          THE COURT:  Yes.  You may note the continuing

11  objection.  Overruled.

12          MR. SINGER:  Thank you.

13  A    The defendant was telling me how the money counter works

14  and when he was -- when he stated that he's getting money from

15  somewhere, something bad, I understood that to mean that he

16  does this frequently and he is aware of him interacting with

17  potentially bad people doing bad things.  That's how I

18  understood it.

19          MS. KASSNER:  If we could play from 11:24 to 12:30.

20          (Audio played; audio paused.)

21  Q    At the end you say, "Okay out of the car walking

22  northbound on Seventh."  Who are you speaking to then?

23  A    I was speaking to the agents that were on surveillance.

24  So not only did my listening device record, but it also

25  transmitted live.  So I was talking to the other agents that I

SN       OCR       RPR

1  knew could hear me.

2  Q    What's going on during the segment of the recording that

3  we just listened to?

4  A    We were starting to set up a potential next meet

5  together.

6  Q    For how much -- how much Bitcoin?

7  A    So, $50,000 worth of Bitcoin.

8  Q    You mentioned during the segment -- you say, "I have an

9  online business so I'm getting money in."

10        Why do you say that?

11 A    Because my undercover story was to be an online drug

12 dealer.  That was the first part of me setting the stage to

13 unfold that story as the defendant and I continued our

14 meetings and transactions.

15 Q    During your first meeting with the defendant, do you

16 mention drugs?

17 A    No.

18 Q    Why not?

19 A    It would be completely out of character for two

20 individuals to meet and if one of them is a drug dealer to

21 divulge the fact that they're a drug dealer during a first

22 encounter.  In my experience in the DEA that never happened.

23 In fact, drugs are -- the real names for drugs are rarely, if

24 ever, used when you're selling drugs.

25 Q    Did you keep a record of the Bitcoin you transferred to

1    the defendant?

2    A     Yes.

3              MS. KASSNER:   If we could show just the witness

4    Government Exhibits 1 through 5 and Government Exhibit 7 and

5    we'll show them to you one by one on your screen.

6              (Exhibit published to witness only.)

7    Q     Do you recognize Government Exhibits 1 through 5 and 7?

8    A     Right now we're just scrolling through the exhibits.

9              Yes, I recognize these.

10   Q     What are Government Exhibits 1 through 5 and Government

11   Exhibit 7?

12   A     These are photographs of the transaction receipts from

13   our undercover cryptocurrency wallet.

14             MS. KASSNER:   At this time the Government would move

15   to admit Government Exhibits 1 through 5 and 7 into evidence.

16             THE COURT:   Any objection?

17             MR. SINGER:   No, Your Honor.

18             THE COURT:   All right.  1 through 5 and 7 are

19   admitted.

20             (Government Exhibits Exhibit 1 through 5 and 7

21   received in evidence.)

22             THE COURT:   And you may publish them to the jury.

23             MS. KASSNER:   If we could publish Government Exhibit

24   7, please.

25             (Exhibit published.)

O'Kain - direct - Kassner                    286

1   Q    So if you could just repeat what this is, Government
2   Exhibit 7?
3   A    This is a photograph of the receipt that the
4   cryptocurrency wallet that we were using offers after you make
5   a transaction with cryptocurrency.
6   Q    There's a section that says to -- well, I'll ask how much
7   Bitcoin did you actually exchange?
8   A    So, the top series of numbers .70453034 BTC.  That is the
9   amount of Bitcoin that I sent to the defendant.
10  Q    And there's a section that says "To" and a string of
11  letters and numbers.  What is that?
12  A    That is called a public address and that is essentially
13  the identifier to somebody's wallet, so almost like a bank
14  account number, I guess, but it's a series of letters and
15  numbers and that's tied to, in this case, the defendant's
16  wallet address.
17         MS. KASSNER:  If we could just show the witness
18  Government Exhibits 602 and 607 through 614.
19  Q    And we'll show them to you one at a time and then I will
20  ask you if you recognize them.  So just let us know when
21  you're finished looking at them.
22         (Exhibit published to witness only.)
23  A    (Reviewing.)
24  Q    Do you recognize Government Exhibits 602 and 607 through
25  614?

                    SN      OCR      RPR

O'Kain - direct - Kassner                287

1   A     I do.

2   Q     What are they?

3   A     They are photographs of the cash that I received from my

4   transactions with the defendant.

5            MS. KASSNER:  At this time the Government would move

6   to admit Government Exhibits 602 and 607 through 614 into

7   evidence.

8            THE COURT:  Any objection?

9            MR. SINGER:  No.

10           THE COURT:  They're admitted.

11           (Government Exhibits 602 and 607 through 614

12   received in evidence.)

13           THE COURT:  You may publish.

14           MS. KASSNER:  614.

15           (Exhibit published.)

16   Q     What is Government Exhibit 614?

17   A     This is a photograph of the cash that I received from the

18   defendant I believe on that first -- following that first

19   transaction.

20   Q     What did you do with the cash after you received it from

21   the defendant?

22   A     After we took photographs, and scanned it in to record

23   the serial numbers, we would give all of the currency to the

24   DEA's high-value custodians and then that unit of the DEA

25   handles it according to their procedures but as agents that

1  seized money off of -- during an investigation, that's the

2  process where we give it to the DEA's high-value team.

3  Q    Is that consistent with the DEA's normal practices and

4  procedures?

5  A    Yes.

6  Q    After your interaction on August 28, 2018, did you

7  ultimately determine Michael's legal name?

8  A    Yes, we did.

9  Q    How did you do that?

10  A    I believe it was through his license plate on his car

11  which was GOKLU.  We ran the license plate into DMV records to

12  identify his true identify.

13            MS. KASSNER:  If we could pull up a photograph

14  marked as Government Exhibit 601, just for the witness.

15            (Exhibit published to witness only.)

16  Q    Do you recognize Government Exhibit 601?

17  A    Yes, I do.

18  Q    What is it?

19  A    This is the photo of the defendant that I believe was on

20  file with the DMV.

21            MS. KASSNER:  The Government would move to admit

22  Government Exhibit 601 into evidence.

23            THE COURT:  Any objection?

24            MR. SINGER:  No.

25            THE COURT:  All right.  601 is admitted.

1              (Government Exhibit 601 received in evidence.)

2              THE COURT:  And you may publish it.

3              (Exhibit published.)

4    BY MS. KASSNER:

5    Q    Is this photo consistent with how the defendant appeared

6    when you met him in 2018?

7    A    Yes.

8              MS. KASSNER:  If we could pull up for the witness

9    Government Exhibit 604.

10             (Exhibit published to witness only.)

11   BY MS. KASSNER:

12   Q    Do you recognize Government Exhibit 604?

13   A    I do.

14   Q    What is it?

15   A    This is a surveillance photo of the defendant standing

16   outside of his vehicle, the black Mercedes sedan that I

17   referenced.

18             MS. KASSNER:  The Government moves to admit

19   Government Exhibit 604 and to publish it to the jury.

20             THE COURT:  You may.  Did you want to establish a

21   date or did he say?

22   BY MS. KASSNER:

23   Q    Is this a fair and accurate depiction of the car the

24   defendant was driving and the defendant as he appeared in

25   2018?

1   A    Yes.

2            THE COURT:  Just the year 2018?

3   Q    In August 2018?

4   A    Yes.

5            THE COURT:  All right.  Any objection?

6            MR. SINGER:  No, Your Honor.

7            THE COURT:  604 is admitted.

8            (Government Exhibit 604 received in evidence.)

9            THE COURT:  And you may publish it.

10           (Exhibit published.)

11  BY MS. KASSNER:

12  Q    Is this same car where you met the defendant in 2018 and

13  2019?

14  A    Yes, that appears to be the same car.

15           MS. KASSNER:  At this time may I approach, Your

16  Honor?

17           THE COURT:  Yes, you may.

18           (Counsel approaches.)

19  Q    I just handed you a box within which is Government

20  Exhibit 1003, which has already been admitted into evidence.

21  If you could just open the box and take out the item inside

22  the box.  Do you recognize Government Exhibit 1003?

23  A    I do.

24  Q    What is it?

25  A    This is a money counter and the money counter that was in

1    the defendant's car.

2            MS. KASSNER:  May I approach again?

3            THE COURT:  Yes, of course.

4            (Counsel approaches.)

5            MS. KASSNER:  Your Honor, would it be possible to

6    just allow the jurors to see the money counter?

7            MR. NAVARRO:  I will hand it to Juror 1 --

8            And if you can pass it down.

9            THE COURT:  All right.

10           (Counsel approaches.)

11           MS. KASSNER:  Your Honor, I can continue questioning

12   or I can pause.

13           THE COURT:  I would pause just to make sure you have

14   all the jurors' attention.

15           MS. KASSNER:  Thank you, Your Honor.

16           THE COURT:  Go ahead.

17   BY MS. KASSNER:

18   Q    Did you have any further interactions with the defendant

19   after August 28, 2018?

20   A    Yes, I did.

21   Q    How did you communicate with the defendant?

22   A    Through the Signal app.

23           MS. KASSNER:  If we could pull up what's previously

24   been admitted as Government Exhibit 502 for the jury.

25           THE COURT:  You may.

1              (Exhibit published.)
2    BY MS. KASSNER:
3    Q    So, turning to page -- the first page of Government
4    Exhibit 502, can you read your messages with the defendant
5    that occurred on September 17, 2018 starting at 5:47 p.m. and
6    I'll read the messages from the defendant.
7    A    "Hey you around this week?
8    Q    Wednesday.
9    A    Okay.  What time works for you?  And we have about
10   7,500?"
11   Q    We can pause there.  If we can turn to page two.  And I
12   will start by reading the messages from the defendant in the
13   second half of the page on Thursday, September 20th.
14              "Hi.  At Queens now.  If early is better I can meet
15   you at Queens tonight, Star" -- and then there's an address
16   for Starbucks at 46 Queens Boulevard in Sunnyside, Queens, New
17   York.  And if we could turn to page three to see your
18   response.
19              THE COURT:  Just so the record is clear, visually
20   the dark messages sort of shaded in black are the defendant's.
21              Correct?
22              MS. KASSNER:  Yes, Your Honor.
23              THE COURT:  Because as you read them, it's helpful
24   to point that out so people know where you're reading from.
25              MS. KASSNER:  Yes, Your Honor.

1           THE COURT:  Okay, go ahead.

2    BY MS. KASSNER:

3    Q    So after the defendant at the top sends that Starbucks

4    address, how do you respond at 5:21 p.m.?

5    A    I write:

6              "I don't know if I can make it out there tonight.

7    Can you do tomorrow morning like 11?"

8    Q    If we can keep scrolling to the next page, page four of

9    Government Exhibit 502.  In the middle of the page on Friday

10   September 21, 2018, can you read your message starting at

11   12:02 p.m.?

12   A    "Hi.  I'm heading over now should be there around 12:30."

13   Q    "Okay" says the defendant.  And how do you respond?

14   A    "Here."

15   Q    And then the defendant responds "five min."  Here

16   outside.  And how do you respond?

17   A    "K."

18   Q    What, if anything, happened after you wrote K at 12:34

19   p.m. on September 21, 2018?

20   A    I met with the defendant outside of the Starbucks that

21   was referenced in those messages.

22           MS. KASSNER:  If we could show just the witness

23   what's been previously marked at Government Exhibit 305.

24           (Exhibit published to witness only.)

25   Q    Do you recognize the area shown in Government Exhibit

1    305?

2    A    I do.

3    Q    What is that area?

4    A    That's an aerial view of the area where the Starbucks is

5    that was referenced in that chat.

6           MS. KASSNER:  Your Honor, the Government would move

7    to admit Government Exhibit 305 into evidence and publish it

8    to the jury.

9           THE COURT:  Any objection?

10          MR. SINGER:  No, Your Honor.

11          THE COURT:  305 is admitted.

12          (Government Exhibit 305 received in evidence.)

13          THE COURT:  And you may publish.

14          (Exhibit published.)

15   BY MS. KASSNER:

16   Q    Using Government Exhibit 305 can you note for the jury

17   where you met the defendant on September 21, 2018?

18   A    On the street directly in front of where that red pin is.

19   Q    Are you generally familiar with the neighborhood around

20   the Starbucks at 4609 Queens Boulevard in Sunnyside, Queens?

21   A    I am, yes.

22   Q    Can you describe the area for the jury?

23   A    Yeah, it's a neighborhood in Queens so a lot of -- a lot

24   of vehicle traffic, no skyscrapers like there are in

25   Manhattan.  There are a lot of shops lining the streets,

1   relatively busy.

2   Q    Were any other DEA agents present during that transaction

3   in the vicinity?

4   A    Yes, there were agents, surveillance agents, around just

5   like the previous time.

6   Q    Was the transaction recorded?

7   A    This one it was not.  We attempted to but the recording

8   cut out immediately as I got to the defendant's vehicle.

9            MS. KASSNER:  Permission, Your Honor, to play

10  Government Exhibit 802 from timestamp 11 to the finish for the

11  jury?

12           THE COURT:  Yes, you may.  Are you going to refer

13  them to the --

14           MS. KASSNER:  Yes, Your Honor.

15  BY MS. KASSNER:

16  Q    There's another tab in the binder which is marked 802

17  with an R at the top.

18           THE COURT:  Before you start the video --

19           Ladies and gentlemen, I also wanted to advise you

20  that the transcripts that you're reviewing along with

21  listening to the audio are merely aids to your listening.  In

22  other words, it's your hearing of what happens on the audio

23  what governs here, not what's transcribed.

24  A    If there's some difference between them, remember it's

25  your hearing of the audio that matters; not so much the

SN        OCR        RPR

1    transcript.  Along the same lines, I want you to know that the

2    transcripts themselves, because they're only aids to your

3    listening and not evidence, will not be sent back with you to

4    the jury room for your deliberations, but the audio will be

5    available to you.  So just keep that in mind.  Go ahead.

6              (Audio played/audio paused.)

7    BY MS. KASSNER:

8    Q    So, you mentioned earlier that the audio equipment

9    failed.  Can you explain -- is that something that's happened

10   in your experience at the DEA?

11   A    Yeah.  I mean, it doesn't happen all the time but it does

12   happen.  So that it wasn't too abnormal.  It was unfortunate,

13   but that has happened before.

14   Q    Can you explain to the jury what, if anything, happened

15   during your meeting with the defendant on September 21, 2018

16   right after the recording cut out?

17   A    Yes, the defendant and I -- we negotiated or conducted a

18   Bitcoin-for-cash exchange that was very similar to the process

19   that I described before from the first one.  So, I exchanged

20   Bitcoin and received cash.

21             MS. KASSNER:  Permission to publish what's been

22   previously admitted as Government Exhibit 1 for the jury.

23             THE COURT:  Yes, you may.

24             (Exhibit published.)

25   Q    What is Government Exhibit 1?

SN        OCR        RPR

O'Kain - direct - Kassner                    297

1    A    This is a photograph of the receipt regarding that

2    transaction from our cryptocurrency wallet.

3    Q    How much Bitcoin did you transfer to the defendant on

4    September 21, 2018?

5    A    1.096872021 Bitcoin.

6         MS. KASSNER:  Permission to publish what's been

7    previously admitted as Government Exhibit 602 for the jury?

8         THE COURT:  Yes.

9         (Exhibit published.)

10   BY MS. KASSNER:

11   Q    What is Government Exhibit 602?

12   A    I believe that's the cash that I received from that

13   transaction.

14   Q    What did you do with the cash after you received it from

15   the defendant?

16   A    We took it to the DEA's high-value custodian team.  I

17   cannot recall what that unit actually is called, but it's the

18   entity at the DEA that handles the seized money and the

19   high-value items.

20   Q    And is that what you did with all of the cash that you

21   received from the defendant in 2018 and 2019?

22   A    That's correct.

23   Q    Did you have any further dealings with the defendant

24   after this date?

25   A    I did.

O'Kain - direct - Kassner                    298

1     MS. KASSNER:  If we could pull up what's been

2   previously admitted as Government Exhibit 503.

3     (Exhibit published.)

4   Q   Beginning with the messages on Monday, November 26, 2018

5   at 1:03 p.m. can you read your messages into the record which

6   are the light gray messages on the right and then I will read

7   the defendant's messages into the record which are the dark

8   gray bubbles to the left.

9   A   "Hey man.  It's been a while are you around this week?

10  Q   Hi, yes, how much you selling?

11  A   About 60K.

12  Q   When?

13  A   Tomorrow.

14  Q   Let me try and make fund ready.

15  A   Okay.  When will you know?"

16  Q   What does 60K refer to here?

17  A   That's $60,000.

18  Q   If we can continue on to page two and I'll continue

19  reading the defendant's messages.

20     (Exhibit published.)

21  Q   "Will text you.  Cash from bank started to be a problem

22  but I can get.

23  A   Okay. "

24  Q   And if we can continue on to page three, in the middle of

25  the page on Tuesday November 27, 2018, you write:  "Hey, you

1  still good today?"

2          What are you referring to there?

3  A    The -- meaning that, the meeting that we were starting to

4  establish.

5  Q    And turning to the next page, page four.  In the middle

6  of the page you say:  "Hey, I'm here.  I'm at the Wendy's near

7  where we met last time."

8          Where were you when you wrote this message?

9  A    I was somewhere near, if not in the parking lot of the

10  Wendy's.  I believe I was in the parking lot in another

11  agent's vehicle.  And the -- it was across the street and

12  adjacent from the Starbucks where we met the previous time.

13  Q    What, if anything, happened after you wrote -- you wrote

14  this message and then later at 1:45 p.m. said, "Yeah," on

15  November 27th?

16  A    Well, I met up with the defendant in the parking lot of

17  the Wendy's.

18          MS. KASSNER:  If we can pull up what's previously

19  been admitted into evidence as Government Exhibit 305 for the

20  jury.

21          (Exhibit published.)

22  Q    Using Government Exhibit 305, can you note for the jury

23  where you met the defendant on November 27, 2018?

24  A    If you can see that blue pin, that's the Wendy's and I

25  was in the parking lot near the Wendy's -- the parking lot of

O'Kain - direct - Kassner                300

1   the Wendy's.  That's where we met.

2   Q    Were any other members of the DEA present for the

3   transaction?

4   A    Yes, I had the DEA surveillance team out.

5   Q    Was the transaction recorded?

6   A    Yes.

7   Q    So I'm going to turn in the binder to the next tab

8   labeled 803R.

9        MS. KASSNER:  And permission to play portions of

10  Government Exhibit 803 to the jury starting at 11 -- timestamp

11  11 to 11:20?

12       THE COURT:  All right.

13       (Audio played/audio paused.)

14  Q    The defendant here says --

15       First of all, where were you during the portion of

16  the recording that we just listened to?

17  A    I just got out of the vehicle that I arrived at the

18  parking lot in and we were sitting outside in the parking lot.

19  Q    The defendant here says, "The black -- the black window

20  scares me."  What did you understand him to be talking about

21  there?

22  A    I understood that he was referring the window tint from

23  the vehicle that I got out of and that was an unmarked

24  government vehicle.  It had very dark tints on the windows.

25  Q    Generally speaking, do law enforcement agents -- do their

1   cars typically have black tinted windows?

2   A    Yeah.

3        MS. KASSNER:   And if we can continue listening

4   beginning at timestamp 13:52 until timestamp 14:25.

5        (Audio played/audio paused.)

6   Q    So here the defendant says, "I can give you some more

7   tomorrow because bank is getting pissed.  When you withdraw

8   too much they get pissed."  What do you understand him to be

9   talking about there?

10  A    I understood that he wasn't buying that he was taking the

11  money out of the bank and he was withdrawing more than the

12  bank would allow him.

13  Q    And there's a sound at the end of the recording.  What is

14  that sound?

15  A    That was the money counter.  So the kind of shuffling of

16  paper there's beeping and shuffling of paper.  That's the

17  money counter.

18  Q    What's happening when you're having this conversation

19  with the defendant?

20  A    The defendant is putting money into the money counter and

21  running it through in an attempt to count the money.

22  Q    And where are you and the defendant both situated at this

23  time?

24  A    I believe we're in the back of his black Mercedes sedan.

25  Q    Are the doors open or closed?

O'Kain - direct - Kassner                          302

1   A    Closed.

2           MS. KASSNER:  If we can continue playing at

3   timestamp 18:53 until 21:42.

4           (Audio played/audio paused.)

5   Q    Could you explain to the jury what's going on during the

6   section of the audio we just listened to?

7   A    So, the defendant and I are at the beginning of that

8   segment of the recording trying to determine how much cash

9   he's going to give me for the amount of Bitcoin that I have.

10  So, then we move into discussing the fee again and I tried to

11  negotiate a smaller fee and we ultimately land on a 7 percent

12  fee for that transaction.

13          MS. KASSNER:  If we can continue playing from

14  timestamp 23:45 to timestamp 25:45.

15          (Audio played/audio paused.)

16  Q    So, in this section, you say, "I have Bitcoin coming in

17  and I turn it into cash as soon as possible."  And you also

18  mentioned that your business, quote, is picking up again.  Why

19  do you say these things?

20          MR. SINGER:  Objection, Your Honor.

21  A    The point of me saying that was --

22          THE COURT:  Overruled.

23  A    -- to get the conversation going about where the money is

24  coming from to get the defendant start asking more questions

25  and also to -- you know, steps to unfold the story, my cover

                    SN      OCR      RPR

1   story, of being an online drug dealer.

2   Q    You also say, "I have to pay people.  They want it in

3   cash."  Why do you say that?

4   A    In my experience when I was a DEA agent oftentimes when

5   people would sell drugs, they had people to pay for those

6   drugs.  So oftentimes they would get them on consignment and

7   once they sold their share, they would have to pay their

8   suppliers back and that's with cash.  So it's part of the

9   cover story that I was using.

10  Q    You also say, "In a week or two, you will have 100 to

11  do."  What do you mean by that?

12  A    I was letting the defendant know I would have $100,000 of

13  Bitcoin to exchange.

14          MS. KASSNER:  If we could continue playing from

15  timestamp 27:45 to 29:25.

16          (Audio played; audio paused.)

17          (Continued on the following page.)

18

19

20

21

22

23

24

25

1    BY MS. KASSNER: (Continuing.)

2

3    Q    So in the beginning, the defendant says, Okay.  Now, I

4    trust you.  The first, I came, I said how the hell do you know

5    if the cops come out of fucking black.  I said, Ops.

6         What did you understand him to be talking about

7    there?

8    A    I understood that he was referencing the tinted windows

9    again where he said that he was scared because of the black

10   tints.  So when he says, he didn't -- you don't know if the

11   cops come out.  It suggested to me that he was aware that

12   there could be potential cops.  That I might have been a cop

13   or undercover or there are undercovers in the area.

14   Q    The defendant also says, My partner is in judgment.  They

15   caught him 50K.

16         What did you understand that to mean?

17   A    I understood that he was telling me that his partner --

18   and I understood "partner" to mean somebody else he's doing

19   this with that also transacts Bitcoin or cryptocurrency for

20   cash got caught doing a transaction.  And 50K, $50,000 worth.

21   Q    Then the defendant says, Because they follow these guys

22   almost always.  And one of the idiots sold their bot from him.

23   So when they tracked him, the drug guy, the cop said, bingo we

24   caught somebody else.

25         What did you understand that to mean?

1  A    So the defendant said that -- before that, they said they

2  weren't tracking for Bitcoins, they were tracking some idiot

3  guy who buys and sells drugs.  So it is a continuation of the

4  story he's telling me about his partner.  The story goes that

5  the law enforcement was following a drug dealer and his

6  partner conducted a transaction with that drug dealer.  And

7  moving forward, while the cops weren't looking at his partner,

8  they came across his partner during that transaction that he

9  was doing with the drug dealer and the defendant said, Bingo.

10 We caught somebody else.  I believe that was in refence to,

11 not only did the law enforcement catch the drug dealer, but

12 they also caught the individual that was laundering that

13 money.

14 Q    You don't think they're looking at you; do you?

15       And the defendant responds, No.  I don't think

16 its -- I mean, it's not a crazy big amount.

17       What did you understand that to mean?

18 A    I understood that the defendant believed that if he was

19 not transacting large amounts then law enforcement would not

20 be looking at him.

21 Q    You say, Either way, I don't want them around.

22       Why did he say that?

23 A    That's just part of my cover story and letting him know

24 that I don't want cops around.  You know, because my cover

25 story is I'm a drug dealer.  Just another thing I can say to

1   let him know that my side of what we're doing in this was not

2   legitimate.

3          MS. KASSNER:  If we can continue playing from 40:30

4   to 49:42.

5                    (Audio recording played.)

6

7                    (Audio recording stopped.)

8   Q    The defendant tells you in this segment of the recording,

9   but just -- I don't want to count money in Manhattan.

10  Manhattan sucks man.

11         What did you understand that to mean?

12  A    Well, the defendant mentioned to me before that he didn't

13  like Manhattan because of the camera and then he referenced

14  the -- so that was the end part of, I think, the first

15  interaction.  And then, again, he said there's a camera on

16  top.  So he references the cameras again.  So at that time, I

17  understood that the defendant was very concerned about getting

18  caught.  And at that time, you know, as I'm conducting this

19  investigation, I took that to mean that he was aware that what

20  he was doing was not -- not legal because otherwise he

21  wouldn't be concerned about cameras seeing him.

22  Q    And then, you again say or you say, I hope they're not

23  looking at you.

24         Why do you say that?

25  A    Again, just to facilitate my cover story.

1      MS. KASSNER:  If we can pull up what was been

2   previously admitted into evidence as Government's Exhibit 2

3   and publish to the jury.

4                  (Exhibit published.)

5   Q    Do you recognize Government's Exhibit 2?

6   A    I do.

7   Q    What is it?

8   A    That's is photograph of the cryptocurrency wallet

9   transaction receipt from November 27th.

10     THE COURT:  Pull the microphone a little lower and

11  speak a little slower.

12     Go ahead.

13  Q    How much Bitcoin did you exchange to the defendant or did

14  you transfer to the defendant on November 27, 2018?

15  A    10.65127282.

16     MS. KASSNER:  If we could pull up, one at a time,

17  for the jury, what's been previously admitted as Government's

18  Exhibit 607 through 610.  So starting with 607 -- actually,

19  starting with 610.  My apologies.  Right.

20     And then 608, and then 609, finally 607.

21  Q    What are Government Exhibit's 607 through 610?

22  A    Those are photographs of the cash that the defendant gave

23  during our transactions.

24     MS. KASSNER:  And I'm going to pause here.

25     Your Honor, I'm not sure if we are doing a break

Patrick O'Kain - Direct - Ms. Kassner                308

1    today.

2         THE COURT:  Actually, why don't we take a break now.

3         We are going to go to 1:00 today, but let's take a

4    10-minute break.  Roughly a quarter of.  So we can make up

5    some of the lost time.  So at a quarter of, let's start again.

6         THE COURTROOM DEPUTY:  All rise.

7         THE COURT:  And leave your binders on the chair.

8    Don't talk about the case.  Just keep an open mind.  Let's

9    take a break.

10         (Jury exits the courtroom.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



SG        OCR        RPR



14          (Jury enters the courtroom.)

15          THE COURT:  Please be seated, everyone.  Welcome

16   back, Ladies and Gentlemen.

17          We are going to resume with the Agent's testimony.

18          You may inquire.

19          MS. KASSNER:  Thank you, Your Honor.

20   BY MS. KASSNER

21   Q    Before the break I was asking you about -- questions

22   about a transaction in November 2018.

23          Did you have any further transactions with the

24   defendant after November 2018?

25   A    Yes.

1          MS. KASSNER:  If we could pull up and publish to the

2    jury what has been previously admitted as Government's

3    Exhibit 504.

4          THE COURT:  All right.

5          (Exhibit published.)

6          MS. KASSNER:  And if we can turn to Page 4 of

7    Government's Exhibit 504.

8    Q    If you could read your messages on the right-hand side in

9    light gray beginning at 11:25 a.m. and I'll read the messages

10   that the defendant sent on the left-hand side.

11   A    Hey, what's your schedule today?

12   Q    Until 3:30, Queens.  How much you want?

13   A    What about tomorrow morning?  Where are you going to be

14   after 3:30?  I need 20K now.

15   Q    Will be in Manhattan after 5:00 p.m.?

16   A    Can you do tomorrow morning for like 12:00.

17   Q    Okay.  Text tomorrow, please.

18         MS. KASSNER:  And if you can turn to Page 6 of

19   Government's Exhibit 504.

20   Q    At 12:36 p.m., you write, Okay.  I'll head to Wendys.

21   And then, at 12:53 p.m. you write, Here.

22         What, if anything, happened after you wrote here at

23   12:53 p.m. on December 11, 2018?

24   A    I, again, I met with the defendant.

25   Q    And earlier there were messages where you discussed

1    meeting in Manhattan.

2              Did you end up meeting in Manhattan?

3    A    I don't believe so.

4              MS. KASSNER:  If we can pull up Government's

5    Exhibit 305, which has been previously admitted to the jury.

6    Q    Using Government's Exhibit 305, can you point out to the

7    jury where you met the defendant on December 11, 2018?

8    A    We met in the parking lot of the Wendys.  And the Wendys

9    is the blue pin.

10   Q    Were any of the members of the DEA present for that

11   transaction?

12   A    Yes, the DEA surveillance team was up.

13   Q    Was the transactions recorded?

14   A    Yes.

15             MS. KASSNER:  Permission to play portions of what

16   has been previously admitted as Government's Exhibit 804 to

17   the jury and I'm also going to turn in the binder to the

18   section marked 804 Exhibit R on top of the transcript.

19             And if you can start at timestamp 10:00 and play

20   until 11:06.

21             (Audio recording played.)

22             (Audio recording stopped.)

23   Q    Where are you and the defendant situated during this

24   portion of the recording?

25   A    We're in the defendant's vehicle, the black Mercedes.

Patrick O'Kain - Direct - Ms. Kassner          313

1  Q    And what's going on here?

2  A    We're getting ready to make a Bitcoin for cash

3  transaction.

4  Q    You say, I've got about 19,600, so 5.16.

5       What does that mean?

6  A    19,600 is the approximate dollar amount of the Bitcoin

7  that I had, which was 5.16, et cetera.

8       MS. KASSNER:  And if we can play starting at

9  timestamp 12:10 to timestamp 13:26.

10      (Audio recording played.)

11      (Audio recording stopped.)

12 Q    What is going on while you and the defendant is having

13 the conversation?

14 A    The defendant is trying to calculate the amount of cash

15 to give me for the amount of Bitcoin that I have less the fee

16 he's taking out.  There was a little confusion on the -- how

17 much Bitcoin I had, so that's why we had -- there was a little

18 confusion over the exact amount of Bitcoin that I had at the

19 time.  So that's why we went back and forth several times.

20      THE COURT:  Again, remember to pull the microphone

21 close to you.

22      Go ahead.

23      MS. KASSNER:  If we can continue playing starting at

24 14:05 to timestamp 14:50.

25      (Audio recording played.)

SG       OCR       RPR

Patrick O'Kain - Direct - Ms. Kassner          314

1          (Audio recording stopped.)

2   Q    So you say here, The last week I needed to get the rest

3   of the 20.  I had to go out to California to explain why I

4   didn't have their 20 grand?

5          THE COURT:  You have to read a little slower.

6          MS. KASSNER:  Understood, Your Honor.

7          So I'll pause here.

8   Q    Why did you say that?

9   A    That was part of my cover story.  I was opening up on,

10  you know, where the money that I was getting and where the

11  money needed to go to.  Starting to plant seeds for that

12  hoping that the defendant would kind of ask more questions

13  about why I needed to take cash to California, et cetera.

14  Q    Did the defendant ask more questions?

15  A    No.

16          MS. KASSNER:  If we could continue playing at times

17  tamp 19:30 to timestamp 21:24.

18          (Audio recording played.)

19          (Audio recording stopped.)

20  Q    So in this segment, you say -- you talk about having "A

21  lot of people to say pay."  You say, they are not great

22  people.  But I'm going to have a lot of money coming in after

23  the New Year.  A hundred grand, can you do that?

24          What are you saying here essentially.

25  A    I mean, talking more about what I'm doing, where the

1   money is going and coming from, and I tell him directly that

2   the people I have to pay are not good people.  Letting him

3   know that the -- my attempt was letting him know that the

4   money was -- that I was involved in something not good.

5   Something that was concerning.  So, you know, a lot of that

6   was to, you know, unfold the cover story about me being a

7   online drug dealer.  And also, a large part of this was

8   hinting at that this was -- I'm not doing something legitimate

9   and he is transacting with someone that is not doing something

10  legitimate and getting him to start asking, but those

11  questions -- he never really asked any questions about it.

12  And moving onto a hundred grand, I told him that business was

13  going great and I should have $100,000 worth of Bitcoin in the

14  New Years -- after the New Years.

15  Q    Did the defendant also mention Bitfinex.

16       Are you familiar with Bitfinex?

17  A    My --

18            THE COURT:  Can I stop you for one second.

19            First of all, B-I-T --

20            THE WITNESS:  F-I-N-E-X.

21            THE COURT:  -- F-I-N-E-X.  Okay.

22            Go back to what you just said a moment ago.

23  A    Yeah.  So Bitfinex, I'm familiar that it is a

24  cryptocurrency exchange, but beyond that, I'm not sure where

25  it's domiciled, but it is a cryptocurrency exchange.

Patrick O'Kain - Direct - Ms. Kassner          316

1      MS. KASSNER:  If we can continue playing starting at
2  timestamp 24:40 to timestamp 25:45.
3          (Audio recording played.)
4          (Audio recording stopped.)
5          MS. KASSNER:  We can actually keep playing.
6          (Audio playing).
7          Audio stopped).
8  Q    So earlier in the segment you say, That you will be
9  getting a hundred either next week or the week after.  And
10  then you explain, It's like depending on how much we sell, you
11  know.
12          What do you mean by that?
13  A    Well, first I told the defendant that I have $100,000
14  worth of Bitcoin to exchange with him shortly.  And then, when
15  I said, it depends on how much we sell.  Again, that's the
16  trying to get the defendant to say, well, what are you selling
17  to have $100,000?
18  Q    And then, the defendant later says, If you want, I have
19  another 50.  And then, he says, no.  No.  No.  Hold on.
20  Another 20, 25.
21          What did you understand that to mean?
22  A    The defendant had an extra $25,000 cash at that moment
23  that he could exchange with me in addition to what we already
24  agreed upon.
25  Q    And then, the defendant says, NYPD use people like this.

Patrick O'Kain - Direct - Ms. Kassner          317

1  In Manhattan that, this is the way, I don't go fucking

2  Manhattan.  Even a homeless, I saw.  He's working for NYPD.

3          Can you explain what's --

4          THE COURT:  Yeah.  Pause.

5          Go ahead.

6  Q    Can you explain what's going on when the defendant makes

7  that statement?

8  A    Yes.  At that time, there were two individuals -- I

9  believe there were two individuals that walked through the

10 parking lot behind the defendant's vehicle and I guess they

11 were wearing raggedy clothes and appeared to be homeless.  And

12 the defendant noticed them and then told me a story saying,

13 the NYPD, New York Police Department, uses people like that.

14 Uses homeless people.  And I understood that to mean, he

15 believes that the law enforcement will used homeless people to

16 conduct surveillance or try to identify people doing illegal

17 things.  So my -- I guess to -- my frame of mind at the time

18 when he's saying that, it's again, referencing police,

19 referencing -- implying that he doesn't want to be caught.

20 The way I interrupted that, that the defendant understood we

21 were doing was warranted potential law enforcement attention.

22          MS. KASSNER:  If we can continue playing from

23 timestamp 26:30 to 27:40.

24          (Audio recording played.)

25          (Audio recording stopped.)

SG          OCR          RPR

1  Q    So during the first portion of this recorded segment, who

2  are you speaking to?

3  A    So that was right after the defendant asked if I wanted

4  another 20, 25 grand.  So I made an actual call to special

5  agent -- former Special Agent Liefke, so we spoke.  While

6  Allan was not typically acting in an undercover capacity for

7  this case, during that specific call he was.  So in that

8  moment, I was pretending as if Allan was my business partner

9  in this online drug business.  So I made this phone call to

10  him and asked him if we wanted the other money that the

11  defendant was offering us.

12  Q    Where is the defendant during your call with Special

13  Agent Liefke?

14  A    Right beside me in the vehicle.

15  Q    Was the call made so that he could hear and understand

16  what you were saying?

17  A    I made the call so he could hear at least what I was

18  saying to Allan.

19  Q    During your call to Special Agent Liefke, you

20  referenced -- you say, I don't know if it make sense or we

21  just do it when we sell the other three keys.

22        What does keys mean?

23  A    So keys, that's a short for kilogram and that's very

24  common terminology for when you're selling drugs.  A kilogram

25  for cocaine or heroin, what -- you call that a key.  You

1  wouldn't necessarily reference the drug, but you would say,

2  Hey, I have a key.  I want to sell a key.  So that's why I

3  specifically said keys in front of the defendant.  And yeah,

4  keys are just -- like I said earlier, drug dealers don't

5  typically ever mention the actual name of the drug when

6  they're making transactions, so keys was kind of a normal

7  thing that a drug dealer would say.

8  Q    And at the end of the recording you could sort of hear

9  certain things slamming.

10         Where are you going at the end of the recording?

11  A    I don't recall.

12  Q    Well, I guess I'll say that you say, Bye, dude.  I'll see

13  you next time.

14         What happened after you said I'll see you next time?

15  A    I believe I got out of the vehicle.  We didn't have any

16  more interaction at that specific time.

17         MS. KASSNER:  If we can pull up what has been

18  previously admitted as Government's Exhibit 3 and publish it

19  to the jury.

20         THE COURT:  All right.

21                  (Exhibit published.)

22  Q    Do you recognize Government's Exhibit 3?

23  A    I do.  This is, again, the photograph of the

24  cryptocurrency wallet transaction receipt.

25  Q    In total, how much did you transfer to the defendant on

1   December 11, 2018?

2   A    5.86191089 Bitcoin.

3          MS. KASSNER:  Permission to publish what has been

4   previously admitted as Government's Exhibit 611 to the jury.

5          THE COURT:  Go right ahead.

6                    (Exhibit published.)

7   Q    Do you recognize Government's Exhibit 611?

8   A    Yes.  That is cash that I received from the defendant.

9   Q    Did you have any further dealings with the defendant

10  after December 11, 2018?

11  A    Yes.

12         MS. KASSNER:  If we could pull up what has been

13  previously admitted as Government's Exhibit 505 and publish it

14  to the jury and turn it Page 2.

15  Q    So beginning on January 23, 2019, could you read your

16  messages in the light gray on the right into the record and

17  I'll read the defendant's messages in the dark gray to the

18  left?

19  A    Sure.

20         When did you want me to start?

21  Q    At 12:55 p.m. on January 23rd in the middle?

22  A    Okay.  Hey, tomorrow at 1:00 work for you?

23  Q    Hi there.  How much?

24  A    Hey, 100 still.

25  Q    Oh, was blocking chat history to find you dude.  I got

1   big last week via gold deal rate.  Sorry, I can't handle.

2          MS. KASSNER:  And if we can continue onto the next

3   page, which is Page 3 of the exhibit.  If you could continue

4   reading your messages.

5   A    What?

6   Q    Tried to contact you, but couldn't find chat history.

7          So when the defendant says that tried to contact you

8   but couldn't find chat history, what did you understand that

9   to mean?

10  A    Yeah.  Tough to say.  I think one of options that came to

11  mind was he deleted our chat history before so he couldn't

12  find the contact and that's why he was -- I think he was

13  uncertain.  He said he couldn't find where I was, so -- but

14  tough to tell.

15         MS. KASSNER:  If we can continue onto Page 4.

16  Q    Here you ask, What happened to you being able to do 100

17  every other week?

18         And the defendant responds, someone offer a big BTC

19  with percent ten.  I get all amount full of BTC, no cash.

20         What did you understand this discussion to mean?

21  A    So the defendant, instead of committing the $100,000

22  transaction with me, he told me that he found someone with a

23  better offer.  He made the transaction with another individual

24  and it was for a 10 percent fee.  So he gave all of his cash

25  to this individual for Bitcoin, so now the defendant only had

1  Bitcoin.

2          MS. KASSNER:  If we could continue onto Page 5.

3  Q    At the bottom of Page 5 of Government's Exhibit 505, the

4  defendant says at 3:06p.m., I have 25K today, but really don't

5  know for future in and outs.  I have 8 percent guy ready.

6  Will give him if you don't want it.

7          What did you understand that to mean?

8  A    I understood that the defendant had $25,000 worth of cash

9  at this time and he also was able -- he was potentially able

10 to transact with that $25,000 with another individual that

11 could offer him 8 percent in fees.

12         MS. KASSNER:  If we can continue onto Page 8 of

13 Government's Exhibit 505.

14 Q    At the top you say, I'll do the 25K.  You sure that's all

15 you can get today?  Can you do at least 50 or LWAST 50.

16         And defendant responds, No, sorry.  Max today 25K.

17         What did you understand that to mean?

18 A    I asked the defendant if he could do $50,000.  If he

19 could transact with $50,000.  He said, no.  That he only had

20 $25,000.

21         MS. KASSNER:  And turning to Page 10 of Government's

22 Exhibit 505.

23 Q    At 2:13 p.m. you write, pulling in.  And then, 2:19 you

24 write behind you.

25         And then, the defendant responds, okay.

Patrick O'Kain - Direct - Ms. Kassner          323

1          What happens, if anything, right after you wrote
2     behind you at 2:19 p.m. on January 24, 2019?
3     A    I meet up with the defendant again.
4          MS. KASSNER:  If we could pull up what has been
5     previously admitted Government's Exhibit 305.
6     Q    Using Government's Exhibit 305, can you point out to the
7     jury where you met the defendant on January 24, 2018?
8     A    At the Wendys in the blue pin.
9     Q    Were other members of the DEA in the vicinity for the
10    transaction?
11    A    Yes.  The DEA surveillance team was present.
12    Q    Was the transaction audio recorded?
13    A    Yes.
14         MS. KASSNER:  Permission to play portions of
15    Government's Exhibit 806, which has been admitted into
16    evidence for the jury.
17         THE COURT:  You may.
18         MS. KASSNER:  And I'm going to turn to the tap 806R
19    in the transcript to correspond what we're playing.
20         THE COURT:  Just remember to read slowly if you're
21    reading parts to the Agent.
22         MS. KASSNER:  Noted, Your Honor.
23         Thank you.
24         If we can start at timestamp 08:52 and play until
25    timestamp 10:55.

1           (Audio recording played.)

2           (Audio recording stopped.)

3   Q     What's happening during the portion of the audio

4   recording that we just listened to?

5   A     We start to make a Bitcoin for currency transaction.   We

6   talk about why the defendant didn't have the $100,000 that we

7   previously agreed upon.

8   Q     The defendant says, Scary man.   It's every time.   This

9   place is not good.   Every time someone here.   Too fucking four

10  black tinted cars there.

11          What did you understand him to be saying here?

12  A     The defendant was -- I guess he noticed two cars with

13  dark tinted windows and he was calling them out to me.   I'm

14  actually not sure whether they were surveillance cars or just

15  generally car with black tinted windows.   I can't say.   Again,

16  at the time, I noted that again the defendant was cognizant

17  about the potential for law enforcement to be there and

18  showing concern about it.   He said this place was no good

19  because he assumed that there were potentially law enforcement

20  vehicles in the area.

21

22          (Continued on the following page.)

23

24

25

SG        OCR        RPR

O'Kain - direct - Kassner                325

1   BY MS. KASSNER: (Continuing.)

2   Q    The defendant also says towards the end of the segment,

3   "Most finks become trouble.  They keep calling, hey, where is

4   the money coming from?"

5          What did you understand him to be saying here?

6   A    I guess he was implying to me that the banks were giving

7   him a hard time and asking him where he was getting his money

8   and that was causing problems for him.

9          MS. KASSNER:  If we can continue playing at

10  timestamp 19:55 to 20:36.

11         (Audio played/audio paused.)

12  Q    The defendant here says he has money in Turkey.  If I

13  withdraw that it's going to take two or three days at least.

14         What do you understand him to be saying here?

15  A    I understood that the defendant was telling me he had

16  funds in Turkey.  I'm not sure where, if it was a bank or

17  whatnot, but if he wanted to try to withdraw that to use for

18  our transactions, it would take some time.

19         MS. KASSNER:  If we can play timestamp 21:26 to

20  21:52.

21         (Audio played/audio paused.)

22  Q    You say here, "These college kids cannot get enough."

23  Why do you say that?

24  A    I was bringing that up because I was saying we, meaning

25  me and my undercover group in this role that I was playing, we

1  were selling a lot, making a ton of money.  I was saying these

2  college kids cannot get enough.  I didn't specify what, but

3  the intent of that was to let him know that I'm selling

4  something to college kids and opening the door because at this

5  time we've exchanged quite a bit of money, tens, if not

6  100,000 at this point, and getting him to ask what are you

7  selling, and what can't the college kids get enough of.  That

8  was my intent in saying, "These college kids cannot get

9  enough."

10            THE COURT:  All right.

11            MS. KASSNER:  If we can continue playing from

12  timestamp 22:15 through 23:25.

13            (Audio played/audio paused.)

14  Q    So at the beginning of the section we just listened to

15  the defendant says, "Actually I'm exposing myself" and later

16  he says, "I'm visible right now.  If something goes wrong,

17  they can catch your history and say, hey, let me see your

18  wallet."

19            What did you understand him to be saying here?

20  A    I understood that he was implying it's something that he

21  was doing on the phone.  If law enforcement saw it, they would

22  be able to tell that that was his wallet.  I think -- this was

23  quite a long time ago, but I think if you search a wallet

24  address in the browser, that would be in your search history

25  and if the defendant was searching a specific wallet address

1  that would show up in the search history and that would be

2  easy for law enforcement to say you searched this address that

3  must be your wallet so that's how I think I interpreted it.

4  Q    Later the defendant said, "Nothing would happen.  They

5  would seize your money.  It's happened to one guy I know."

6  And you respond, "Yeah, yeah, you told me that."

7        What are you two talking about here?

8  A    So, continuing the conversation about being exposed, the

9  defendant -- why he was concerned was if something went wrong

10  and when I asked, what would go wrong, he told me that it

11  could be seized so at that time it was another indicator that

12  the defendant was fully aware that what he was doing was not

13  legal and that money could be seized by law enforcement.  And

14  then he referenced a person that he knew that had money seized

15  and I assumed he was referring to his business partner or

16  partner from one of the previous interactions that we had.

17  Q    You say, "Well, if I get seized with this, I'm going to

18  get my fucking head chopped off or something."

19        Why do you say that?

20  A    Again, just part of my cover story; letting the defendant

21  know that the people that I was interacting with were not good

22  people; in fact, people that could potentially kill me if I

23  did not pay them their money.

24  Q    And why did you do that?

25  A    Well, I mean, it's part of the cover.  I was posing as an

1   online drug dealer and I was letting him -- letting the
2   defendant know that all of these things that I'm telling him
3   and doing with this money are coming from not great places and
4   it was just another part of my story to let the defendant know
5   that, hey, this money and what we're doing here, this is not
6   coming from a legitimate place.

7           MS. KASSNER:  If we could play from timestamp 23:55
8   to 24:10.

9           (Audio played/audio paused.)

10  Q   Why did you say that you definitely want to keep this
11  under the table?

12  A   I say that to let the defendant know that I'm concerned
13  about my privacy in transacting this money.  So I don't want
14  anyone to be alerted of this.  So keeping it under the table,
15  meaning this is -- what I'm doing needs to stay secret.

16          MS. KASSNER:  If we could play from timestamp 25:35
17  to 26 minutes.

18          (Audio played/audio paused.)

19  Q   What are you and the defendant discussing here?

20  A   I asked him where -- who he gave the $100,000 that he and
21  I previously agreed to transact, I asked him who that went to
22  and, you know, partly to keep the conversation going but also
23  to hopefully get identifying information for another potential
24  individual that was conducting illegal transactions that the
25  DEA could then pivot or extend the investigation to rather.

SG      OCR      RPR

1        MS. KASSNER:  If we could play from timestamp 30:55

2   to 32:15.

3        (Audio played/audio paused.)

4   Q    Here you say, "I'm not touching the Coinbase.  I can't

5   touch the Coinbase."  Why do you say that?

6   A    Coinbase is a commercial exchange.  It has licenses to

7   operate and do business and reporting requirements and it's

8   pretty common knowledge that Coinbase is a legitimate

9   business.  So when I tell the defendant that I'm not touching

10  Coinbase, I can't touch Coinbase, that's reiterating the fact

11  that this needs to stay anonymous so I can't interact with a

12  legitimate cryptocurrency exchange.

13  Q    The defendant tells you, "I mean, don't pass $100,000

14  toward the Coinbase.  They're not going to question you.  But

15  one person, one year, no more than 99, they're not going to

16  question you."

17       What did you understand that to mean?

18  A    I understood that the defendant believed if you

19  transacted up to $99,000 on Coinbase, they would not -- you

20  would not draw attention to yourself, but if you went over

21  $100,000, then the people at Coinbase would become alerted to

22  what you're doing and to a higher volume and then they would

23  start asking questions.  So that's how I interpreted that

24  statement.

25       MS. KASSNER:  If we could play from 31 -- excuse me

1   41:35 to timestamp 43:30.

2          (Audio played/audio paused.)

3   Q    Can you explain for the jury what you and the defendant

4   are discussing here?

5   A    We start discussing actually where I'm getting the money

6   from for the first time.  So, at the beginning of this segment

7   talking about those, those little ones, that's in reference to

8   marijuana -- I don't think part of that conversation was in

9   this segment, but the defendant and I -- he mentioned that he

10  did a transaction with somebody that was selling marijuana.

11         So that's when I started to get more comfortable in

12  talking about -- being more explicit in the drug discussions.

13  So this conversation was coming off of that.  So the little

14  ones and all of that is in reference to marijuana.  And then

15  moving forward -- actually, I'll pause there.  Does that

16  answer part of your question?

17  Q    Sure, I can follow up with additional questions.

18  A    Okay.

19  Q    So, what do you tell the defendant about your business?

20  A    I tell him that I sell oxycodone and Adderall.

21  Q    What is oxycodone?

22  A    Oxycodone is an opiate.  It's a controlled substance.  It

23  is a prescription medication that is only allowed to be sold

24  by a licensed -- well, prescribed by a licensed physician and

25  sold by a licensed pharmacist to somebody that has a valid

1  prescription for it.

2          But it is -- oxycodone and also Adderall are

3  common -- while there are prescription medications they are

4  common recreational street drugs and sold illegally and

5  they're often sold online.  So a lot of the marketplaces that

6  sells -- the illegal marketplaces that sell illegal drugs

7  online, a lot of a portion of their sales are in Adderall,

8  oxycodone and prescription medications like that.

9  Q    Does the DEA investigate people who are involved in the

10 illegal sale of oxycodone?

11 A    Yes, they do.

12 Q    You also mentioned -- well, when you say, "I got that.  I

13 can get you some oxys if you like that shit."  The defendant

14 says, "What's oxys?"  You say, "It's, like, oxycodone, that

15 stuff."  And the defendant responds, "Don't bring those.  Just

16 bring regular street things."

17         What did you understand him to be saying?

18 A    I understood that he didn't want me to bring him any

19 oxys, oxycodones, but he wanted other street drugs and

20 specifically I think he was referring to marijuana in this

21 instance.

22 Q    And you say in response, "Oh, like Adderall?  That's what

23 all the college kids are taking," and you mentioned Adderall

24 earlier.  What is Adderall?

25 A    Adderall is a stimulant.  It's a prescription drug

1   prescribed for ADD, ADHD, but, again, it's a controlled

2   substance.  You have to have -- physicians have to have a

3   license to prescribe it and it has to be distributed by a

4   licensed pharmacist to those individuals with a valid

5   prescription.

6   Q    Does the DEA investigate cases involving the illegal sale

7   of Adderall?

8   A    They do.

9   Q    And then you say later, "You seriously want that stuff

10  because that's what we do.  We do all of that."

11          What do you mean by that?

12  A    I said that to -- in the attempt to make it very clear

13  that that was my business, selling illegal drugs.

14  Q    After you disclosed to the defendant that you were

15  selling Adderall and oxys, does the defendant finish the

16  transaction?

17  A    Yes.

18  Q    Does he at any point say that he, for some reason, would

19  refuse to transact money with you?

20  A    No.

21          MS. KASSNER:  If we could play from timestamp 44:50

22  to 46:38.

23          (Audio played/audio paused.)

24  Q    Who were you speaking to during this segment of the

25  recording?

O'Kain - direct - Kassner                333

1    A     That was Special Agent Alan Liefke.

2    Q     And you asked Special Agent Liefke -- well, did the

3    defendant hear this conversation to the best of your

4    knowledge?

5    A     Yes.

6    Q     And you ask the other undercover agent, "Can you put him

7    off?"  Why do you ask that?

8    A     Just sort of, again, playing the role of online drug

9    dealer, putting off the people that we owe, because the

10   defendant was not able to deliver the money at the time he

11   said he said he would.  It was part of the color story where I

12   said I needed to pay these bad people.

13             THE COURT:  Go a little slower.  Enunciate more.

14   That will slow you down.

15             MS. KASSNER:  If we could play from 48:51 to

16   timestamp 50:20.

17             (Audio played/audio paused.)

18   Q     And what happens during this segment we just listened to?

19   A     We sort of talk about the next interaction, the next

20   transaction and the defendant was just talking about the

21   difficulties or what he has to go through to get the cash,

22   whether it's Bitcoin or cash, to make those transactions.

23             MS. KASSNER:  If we could pull up just briefly

24   what's previously been admitted as Government Exhibit 4 and

25   publish to the jury.

SG       OCR       RPR

1           (Exhibit published.)

2    BY MS. KASSNER:

3    Q    According to Government Exhibit 4, in total how much

4    Bitcoin did you send to the defendant on January 24, 2019?

5    A    7.15946367 Bitcoin.

6           MS. KASSNER:   If we could pull up what's been

7    previously admitted at Government Exhibit 612.

8           (Exhibit published.)

9    Q    What is Government Exhibit 612?

10   A    This is a photograph of the cash that I received from the

11   defendant.

12   Q    Did you have further dealings with the defendant?

13   A    Yes.

14          MS. KASSNER:   If we could publish what's been

15   previously admitted as Government Exhibit 506 to the jury?

16          (Exhibit published.)

17   BY MS. KASSNER:

18   Q    And if we could turn to page six.  On page six of

19   Government Exhibit 506, you write at 3:02 p.m., "Okay, I'm

20   close."  And then you later write, "Okay, five minutes."

21          What, if anything, is happening when you're sending

22   these messages?

23   A    I was traveling to the next meeting location with the

24   defendant.

25   Q    And prior to sending this message about your location,

1  had you arranged to conduct another transaction with the

2  defendant?

3  A    Correct.

4  Q    What, if anything, happened after you wrote "five

5  minutes" or "five min"?

6  A    I had met up with the defendant.

7            MS. KASSNER:  If we could publish for the jury

8  Government Exhibit -- apologies, this hasn't been admitted.

9            If we could show the witness Government Exhibit 301.

10           (Exhibit published to witness only.)

11 Q    Do you recognize Government Exhibit 301?

12 A    Yes.  This is an aerial image of Manhattan right where

13 the defendant and I met on this occasion.  Again, very busy

14 area, large skyscrapers, very commercial.

15           MS. KASSNER:  If we could -- Your Honor, the

16 Government moves at this time to admit Government Exhibit 301

17 into evidence and publish it for the jury.

18           THE COURT:  Any objection?

19           MR. SINGER:  No, Your Honor.

20           THE COURT:  All right.  It's admitted.

21           (Government Exhibit 301 received in evidence.)

22           THE COURT:  And you may publish it.  Just so you

23 know, we're going to stop after this exhibit is shown because

24 I need to take up an issue with the lawyers before we break

25 for the day.

1            (Exhibit published.)

2    BY MS. KASSNER:

3    Q    Could you point out to the jury where either transaction

4    with the defendant occurred on January 30, 2019?

5    A    The transaction occurred essentially where that red pin

6    is placed.



7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

345

<u>I N D E X</u>

<u>WITNESS</u>                                                    <u>PAGEG</u>

PATRICK O'KAIN

    CONTINUED DIRECT EXAMINATION BY MS. KASSNER     267


<u>E X H I B I T S</u>

    Government Exhibits 501 through 507              270

    Government Exhibit 302                           274

    Government Exhibits 801 through 809              276

    Government Exhibits Exhibit 1 through 5 and
    7                                                285

    Government Exhibits 602 and 607 through 614      287

    Government Exhibit 601                           289

    Government Exhibit 604                           290

    Government Exhibit 305                           294

    Government Exhibit 301                           335

346

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,        : 19CR386(PKC)
4
              Plaintiff,            :
5
              -against-            : United States Courthouse
6                                  : Brooklyn, New York
   MUSTAFA GOKLU,                   :
7
              Defendant.           : Thursday, October 6, 2022
8                                  : 9:00 a.m.
                                    :
9                                  :
                                    :
10
   - - - - - - - - - - - - - X
11
       TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
12           BEFORE THE HONORABLE PAMELA K. CHEN
                 UNITED STATES DISTRICT JUDGE
13
                     A P P E A R A N C E S :
14
   For the Government: United States ATTORNEY'S OFFICE
15                     Eastern District of New York
                       271 Cadman Plaza East
16                     Brooklyn, New York 11201
                  BY:  GILLIAN KASSNER, ESQ.
17                     MARIETOU E. DIOUF, ESQ.
                       FRANCISCO NAVARRO, ESQ.
18                     Assistant United States Attorneys

19  For THE DEFENDANT:    MURRAY E. SINGER, ESQ.
                       14 Vanderventer Avenue, Suite 147
20                     Port Washington, New York 11050
                       SAHLI LAW PLLC
21                     195 Broadway, 4th Floor
                       New York, New York  11211
22                     BY:EMILEE SAHLI, ESQ.

23
   Court Reporter:    SOPHIE NOLAN
24                     225 Cadman Plaza East/Brooklyn, NY 11201
                       NolanEDNY@aol.com
25  *Proceedings recorded by mechanical stenography, transcript
   produced by Computer-Aided Transcription*

                     SN       OCR      RPR





Proceedings                                                    348



PATRICK O'KAIN,

    called as a witness, having been previously duly

    sworn, was examined and testified as follows:

```
 1   CONTINUED DIRECT EXAMINATION
 2   BY MS. KASSNER:
 3             THE COURT:  Go ahead, Ms. Kassner.
 4             MS. KASSNER:  Thank you, Your Honor.
 5             At this time if we could show the witness what has
 6   previously been marked as Government Exhibit 622, and --
 7             Apologies, Your Honor, one moment.
 8             (Pause in proceedings.)
 9   Q    Can you see that image on the screen?
10   A    Not yet.
11             (Exhibit published to witness only.)
12   Q    Just let us know when you can see it on the screen.
13   A    I can see it now.
14   Q    Do you recognize what has been marked as Government
15   Exhibit 622?
16   A    I do.
17   Q    What is this?
18   A    This is a photograph of the Starbucks where I met the
19   defendant.
20   Q    And it is a fair and accurate depiction of the Starbucks
21   where you met the defendant on September 21, 2018?
22   A    Yes.
23             MS. KASSNER:  Your Honor, permission to admit
24   Government Exhibit 22 into evidence and publish it to the
25   jury.
```

1          THE COURT:  Any objection?

2          MR. SINGER:  No, Your Honor.

3          THE COURT:  622 is admitted and you may publish it.

4          (Government Exhibit 622 received in evidence.)

5    Q    And you also mentioned that on other dates you met the

6    defendant at a Wendy's also in Sunnyside, Queens; is that

7    correct?

8    A    That's correct.

9          MS. KASSNER:  Your Honor, permission to show the

10   witness what's previously marked as Government Exhibit 621.

11         THE COURT:  All right.

12         (Exhibit published to witness only.)

13   Q    And please let us know when you can see it.

14   A    I see 623 right now.

15         THE COURT:  Did you say 621?

16         MS. KASSNER:  One moment Your Honor, yes, 621.

17   A    Okay, I can see 621 now.

18   Q    Do you recognize Government Exhibit 621?

19   A    I do.

20   Q    What --

21   A    That is the Wendy's in which I met the defendant at.

22   Q    And is it a fair and accurate depiction of where you met

23   the defendant on November 27, 2018, December 11, 2018 and

24   January 24, 2019?

25   A    Yes.

                    SN      OCR      RPR

1          MS. KASSNER:  At this time the Government would move

2    to admit Government Exhibit 621 into evidence and publish it

3    on the jury.

4          THE COURT:  Any objection?

5          MR. SINGER:  No, Your Honor.

6          THE COURT:  621 is admitted and you my publish.

7          (Exhibit published.)

8    BY MS. KASSNER:

9    Q    Thank you.  So, when we left off on Tuesday, we were

10   discussing a further transaction that you had with the

11   defendant on January 30, 2019.  Do you remember that?

12   A    Yes, I do.

13   Q    And we had just shown you an image of the corner 1 East

14   33rd Street in Manhattan.  Do you recall that as well?

15   A    Yes.

16   Q    And, so that transaction, is it fair to say was in

17   midtown Manhattan?

18   A    That's correct.

19   Q    Was that transaction recorded?

20   A    Yes.

21         MS. KASSNER:  Your Honor, at this time the

22   Government would seek permission to play portions of

23   Government Exhibit 807 for the jury.

24         THE COURT:  All right.

25         MS. KASSNER:  I'm going to turn to tab marked 807 R

SN      OCR      RPR

1   in the transcript per.

2          THE COURT:  And again, ladies and gentlemen, these

3   transcripts are just an aid to listening to the audio but what

4   you hear, as opposed to what's on the page, governs.

5          MS. KASSNER:  If we could play from timestamp 9:05

6   to timestamp 9:47.

7          (Audio played/audio paused.)

8          MS. KASSNER:  If we could pause here.

9   Q    Can you describe for the jury what's happening during the

10  segment of the audio recording we just listened to?

11  A    Yes, I met with the defendant and got into his vehicle.

12  Q    And if we can continue playing from timestamp 11:27 to

13  timestamp 12:10 and if we could turn the volume up just a bit.

14         (Audio played/audio paused.)

15  Q    Can you describe to the jury what is happening during the

16  recorded segment that we're listening to?

17         THE COURT:  Ms. Kassner, you may want to point the

18  jury to what page of the transcript you are on and I think the

19  audio skipped mayb7e a page or two, at least by my reckoning.

20  I think we're on page three of 807R where it says "35"?

21         MS. KASSNER:  So, I think we're on page two.

22         THE COURT:  Okay.

23         MS. KASSNER:  So it starts "335, put it in the bag."

24  Does everyone have that?

25         THE COURT:  Maybe I'm crazy.  I'm looking at page

1    two of 807jR?

2              MS. KASSNER:  Your Honor it's -- so there's the

3    cover page and then there's one page.  That was the segment we

4    listened to last and I believe the next page at the top says

5    335.

6              THE COURT:  It's numbered at the bottom two.  Am I

7    the only one that's having this issue?  Maybe it's just me.

8    So just to confirm we're on 807R; correct?

9              MS. KASSNER:  Yes, Your Honor.

10             THE COURT:  And the date is January 30, 2019?

11             MS. KASSNER:  Yes, Your Honor.

12             THE COURT:  And if you look at page two, you're

13   saying at the top it says 35?

14             MS. KASSNER:  So, there should be a page, there's

15   the cover page and then there's one page on the left and then

16   a page on the right.

17             THE COURT:  No, but they're numbered.  It says page

18   two.  Do we that I have different books?

19             MS. KASSNER:  Your Honor, may we approach?

20             THE COURT:  Absolutely.  Maybe I don't have the same

21   book as everyone else.  I was in a different section of the

22   binder.  My apologies, everybody, and especially you,

23   Ms. Kassner.  Please continue.

24   BY MS. KASSNER:

25   Q    So Mr. O'Kain if you could explain what we were just

O-Kain - direct - Kassner                    355

1    listening to?

2    A    The defendant was running cash through the money counter

3    so that was the sound that you heard with the paper flipping.

4    Q    Okay.  And turning to the next page of the transcript.

5         MS. KASSNER:  And if we could play timestamp 16:17

6    to 17:16.

7         (Audio played/audio paused.)

8    Q    Can you explain for the jury what you and the defendant

9    were discussing here?

10   A    We were discussing another transaction for the remaining

11   30 K, 30,000 and the defendant was talking about who he would

12   get that $30,000 from.

13   Q    And the defendant here says, "That idiot, my friend,

14   maybe one time, yeah, he has the money.  I have a lot of money

15   with him but lazy motherfuckers here.  His job is hookers."

16        What did you understand that to mean?

17   A    So I understood that the defendant was saying his friend

18   and where he was going to get that money, his -- he was

19   getting that money from hookers and prostitution.

20        MS. KASSNER:  If we could continue playing at time

21   stamp 24:24 to 24:52.

22        (Audio played/audio paused.)

23   Q    So here the defendant says that the car is bulletproof.

24   What did you understand him to mean by that?

25   A    Just that the defendant was telling me that his vehicle

SN        OCR        RPR

1  was bulletproof and, frankly, I don't recall why he brought

2  that up, but he was trying to imply that his vehicle was

3  bulletproof.

4  Q    And you say, "Who is going to be shooting at us, it's the

5  guy that is back in California who wants the rest of the 100,

6  that's who."  Why did you say that?

7  A    That was a reference to my cover story where I owed money

8  to people back in California.  And it's sort of a reference if

9  you recall I mentioned to him that I had people that I owed

10  money to and they would chop off of my head if I didn't pay

11  them so it was just a reference to those same fictitious

12  individuals in California.

13         MS. KASSNER:  If we could continue playing from

14  27:40, to 28:35.

15         (Audio played/audio paused.)

16  Q    Here the defendant mentions a partner and he says the

17  partner got the cash in the Hamptons and I sent Bitcoin from

18  here.

19         What did you understand that to mean?

20  A    I understood that the defendant was just describing an

21  individual with whom he's transacting with and getting cash

22  from and that's -- the defendant sent that individual

23  Bitcoins.

24  Q    And the defendant also says, "100 one time can we do

25  split?"  And then says, "It's that one is too much, man.  With

1   100 bucks if we get -- if -- if we get in trouble we are both

2   fucked up."  Then he says, "40 is okay.  100, I told you.  You

3   don't tell me working that's --"

4           What did you understand that to be talking about?

5   A    I understood that -- again, the defendant believed that

6   transacting smaller amounts would -- it was safer than doing

7   100.  So I think 100 has come up a couple of times and that

8   was the defendant's belief that if -- if we were transacting

9   100 or larger, we would draw attention, but anything below

10  that the defendant felt safer.  And then to describe, you

11  know, at the time when I was a special agent investigating

12  this case that was just another indication that -- that I

13  believe that the defendant knew that he was doing something

14  elicit because otherwise there would be no talk of splitting

15  things up to avoid getting in trouble.

16  Q    And when you say -- when the defendant says "100," how

17  much money exactly did you understand that to be referring to?

18  A    $100,000.

19  Q    And when he says "40 is okay," how much money did you

20  understand 40 to be referring to?

21  A    $40,000.

22          MS. KASSNER:  If we could continue playing at time

23  scam 32:40 to 33:04, please.

24          (Audio played/audio paused.)

25  Q    Let's pause here.  Rather than playing that section can

1  you tell us what happened with that?  What happened after you
2  had this conversation with the defendant?
3  A    If I recall correctly, the way Bitcoin works, you send
4  Bitcoin and it has to go through the block chain and there's a
5  series of several confirmations that ---- kind of the more
6  confirmations you get, the more trusted that the money
7  actually landed in that wallet and it was taking quite a while
8  for those confirmations to come through.  So that's what we
9  were waiting for.  Through that transaction it took quite a
10  while.  But once we determined that we were comfortable that
11  the transaction went through, I left the meeting.
12          MS. KASSNER:  If we could show you -- if we could
13  publish on the jury what's been previously been admitted as
14  Government Exhibit 5.
15          (Exhibit published.)
16  BY MS. KASSNER:
17  Q    Do you recognize Government Exhibit 5.
18  A    I do.  This is a photograph of the receipt from our
19  undercover cryptocurrency wallet.
20  Q    And how much Bitcoin did you provide to the defendant on
21  January 30, 2019?
22  A    13.67287 Bitcoin.
23          MS. KASSNER:  If we could pull up what's been
24  previously admitted as Government Exhibit 61 -- 613 and
25  publish it to the jury.

O-Kain - direct - Kassner                    359

1          (Exhibit published.)
2    BY MS. KASSNER:
3    Q    What is Government Exhibit 613?
4    A    This is a photograph of the cash that the defendant gave
5    to me during the transaction.
6    Q    Did you meet with the defendant again after January 30,
7    2019?
8    A    Yes.
9          MS. KASSNER:   If we could pull up and publish to the
10   jury what's been previously admitted as Government Exhibit
11   507.
12         (Exhibit published.)
13   Q    And on page one of Government Exhibit 507 starting at
14   6:05 p.m. on April 1st, can you read your messages in light
15   gray to the right and I'll read the defendant's messages in
16   dark gray to the left?
17   A    "Hey."
18   Q    "Hi."
19   A    "Just seeing if you are going to be around next week or
20   the week after."
21   Q    "Yes.  I am around."
22   A    "How much could you do?"
23   Q    "Who is this?  Sorry, history deleted."
24         What did you understand the defendant's last message
25   to mean?

SN        OCR        RPR

1   A    I understood that the defendant deleted the Signal chat
2   history from our previous conversations.
3   Q    Turning to page two of Government Exhibit 507, at the
4   bottom on April 22, 2019, if you could continue reading your
5   messages to the right and I'll read the defendant's messages
6   on the left.
7   A    "Hey, dude.  Can you meet up next week?  I'm flying back
8   from L.A. Saturday or Sunday."
9   Q    "How much?"
10        And if we could continue on to the next page and
11  continue reading.
12  A    "I need 100.
13  Q    Dude, I can do 49,999.  I am a Bitcoin trader, not a
14  money laundering guy.  I refuse when I feel Bitcoin buyer is
15  drug guy.  Yup, real.  I don't care of income.  I refused a
16  lot because they look alike, dirty.  That's why limited.  Can
17  give you rest next day whatever you want.  No bad man here.
18  A    I can do 49,999.  Anything helps.  I know you don't like
19  to do more than 50 at a time.  Hey, man, are you good for next
20  week?
21  Q    Yes, good.  You Saturday or Sunday?"
22        So, I want to pause here.  Here you say "I need 100"
23  and the defendant says "Dude, I can do $49,999."  What did you
24  understand his response to mean?
25  A    I understood that he again felt that doing amounts up to

O-Kain - direct - Kassner                          361

1   100 were risky and he wanted to keep the amount under 50,000

2   or around 50,000.

3   Q    The defendant goes on to say, I am Bitcoin trader not

4   money laundering guy.  I refuse when I feel Bitcoin buyer is

5   drug guy.  And then he says that's why limited.  Can give you

6   rest next day whatever you want.

7          What did you understand him to be saying there?

8   A    I understood that he was implying that he is not doing

9   anything wrong and that's why he wands to do less than 100.

10  He says that he is not a drug guy.

11

12

13

14

15

16

17  BY MS. KASSNER:

18  Q    After sending this message to you did the defendant

19  refuse to meet with you?

20  A    No.

21  Q    Did he ask for clarification about where your money was

22  coming from?

23  A    No.

24  Q    Did he ask you to confirm that you were not a drug

25  dealer?

SN        OCR        RPR

1  A    No.

2  Q    What did he do instead?

3  A    We set up more transactions.

4  Q    So turning to page four, the next page of this Government

5  Exhibit 507, if we could scroll down.  Here we are.  In the

6  middle of the page on April 26, 2019, the defendant asks:

7           "Do you want to sell?"  How did you respond?

8  A    "Yeah.  Can you do 50 on Tuesday?

9  Q    "Okay, text when ready."

10          And if we could turn to page seven of this exhibit,

11  here at 12:28 p.m. you write:

12          "Five out."  The defendant responds "coming Wendy."

13  You write "Okay where?"  The defendant responds backside.

14  What happened right after the defendant wrote backside on

15  April 30, 2019?

16  A    I believe I get into the -- meet up with the defendant

17  again.

18  Q    Was your interaction with the defendant recorded?

19  A    Yes.

20          MS. KASSNER:  Permission to play portions of

21  Government Exhibit 809.

22          THE COURT:  You may.

23          MS. KASSNER:  And I'm turning to the portion of the

24  transcript marked 809 with an R on top.  If we could start at

25  timestamp 13:05 and end at 15 minutes.

1        THE COURT:  In case anyone is concerned, I'm on the

2   same page.

3        (Audio played/audio paused.)

4        MR. NAVARRO:  Your Honor, one second.  We're just

5   having a technical problem.

6        THE COURT:  All right.

7        (Audio played/audio paused.)

8   BY MS. KASSNER:

9   Q    Can you tell the jury where you were seated during this

10  conversation?

11  A    I was inside the defendant's vehicle.  I can't recall if

12  I was in the back or the front seat though.

13  Q    When the defendant asked about your business, you say,

14  "booming.  I'm making tons of money, man."  Why did you say

15  that?

16  A    That was a continuation of my cover story that I was

17  selling drugs online and I was letting the defendant know that

18  I had consistent money coming into the business.

19  Q    The defendant asked about a cannabis farm and you

20  respond, "I don't make -- I don't make them as much as

21  cannabis."  You say, "I sell pounds of that in California but

22  the real money is in Adderall and the pills."  Why do you say

23  that?

24  A    I wanted to make it clear to the defendant again that the

25  money was not coming from just cannabis but also more of it

1  was coming from Adderall and the other pills.  The reason I

2  said that was because based on the uncertain legalities of

3  marijuana at the time in California I wanted to make sure that

4  this money was coming from Adderall and other controlled

5  substances.

6  Q    After you mentioned the Adderall and the pills, how does

7  the defendant respond?

8  A    He asks how much do I want, meaning how much money do I

9  want for this transaction to work.

10          MS. KASSNER:  If we can continue playing starting at

11  15 and ending at 16.

12  Q    What is happening during this section of the recording we

13  just listened to?

14  A    I'm clarifying with the defendant how much money we're

15  going to transact.  And the defendant again reiterates that he

16  doesn't like to do large amounts, like 100,000 and then we

17  start to count the money or send the money through the money

18  counter and there were some technical difficulties with the

19  money counter but ultimately it sounds like the money cycled

20  through the machine.

21  Q    And here you say "I always need the 100."  Why do you say

22  that?

23  A    Just to let the defendant know that I still need to

24  transact more money from my online drug business.

25  Q    And the defendants response is he's, scared from the

1  hundreds, man.  What did you understand that to mean in
2  particular?
3  A    Just again that he doesn't like to do $100,000 because he
4  believes that that is an amount that could potentially draw
5  attention and get him in trouble.
6           MS. KASSNER:  And if we could continue playing from
7  timestamp 18:50 to 19:33.
8           (Audio played/audio paused.)
9  Q    Here the defendant says, "Somebody told me you can buy
10 cannabis farm in California to do cannabis business."  You
11 respond and, "Say still risky though, my buddy got arrested
12 the other day."
13          What do you mean by that?
14 A    I made that part up.  That was just setting the stage to
15 let the defendant know that marijuana was illegal federally,
16 still.
17 Q    And the defendant asks, "Why is that and you say still
18 federally.  I mean, he got arrested by the feds."  Why did you
19 say that?
20 A    Just to let the defendant know that that marijuana was
21 illegal federally because part of what the defendant believed
22 I was selling was marijuana and I was letting him know that
23 that is illegal as well.
24 Q    Is marijuana a controlled substance under federal law?
25 A    It is.

1  Q    The defendant says, got to be in California.  If you go

2  out it's trouble, right?  What did you understand him to mean

3  there?

4  A    I understood that the defendant was aware that there were

5  different laws between California and outside of California.

6  And that if you sell marijuana outside of California, he knew

7  that you could get in trouble.

8  Q    If we could continue playing at timestamp 21:45 to 22:34.

9        (Audio played/audio paused.)

10 Q    What is happening during the segment of the recording we

11 just listened to?

12 A    The defendant is running money through the money counter

13 and, I believe he's offering more -- he had more money that he

14 was willing to transact with me at that time.

15 Q    So the defendant asks -- he says, that's 50, this is 25,

16 total 75.  How much did you understand that he was offering to

17 exchange in total?

18 A    $75,000.

19 Q    And is this -- just for clarity is this before or after

20 your conversation with the defendant about whether or not

21 marijuana is legal in California, out of California?

22 A    It's right afterwards.

23 Q    And if we could finish playing until timestamp 23:40.

24        (Audio played/audio paused.)

25 Q    So during the first half the recording, you are speaking

1  to somebody other than the defendant.  Who are you talking

2  to?

3  A    That was a call to former Special Agent Allan Liefke.

4  Q    And what did you discuss with Special Agent Liefke?

5  A    So, prior to this specific transaction with the

6  defendant, myself and the entire investigative team working on

7  this case determined that that was going to be the time that

8  we arrested the defendant.  And prior to the meeting, we

9  agreed on a specific arrest Signal and when I called Special

10 Agent Liefke, what was when I gave him the arrest Signal and I

11 will pause there.

12 Q    What happened during the second portion of the

13 recording?

14 A    When you hear the yelling, is that -- so, yeah, that's --

15 there was an arrest team and the defendant and I were sitting

16 in the back of the defendant's vehicle and the DEA arrest team

17 came up and opened the car doors, announced police, and

18 arrested both the defendant and myself but that part of when I

19 was arrested that was still in an undercover capacity.

20 Q    Why did they arrest you?

21 A    We weren't -- depending on how the arrest of the

22 defendant went, I wasn't sure if it was going to be more

23 beneficial to the investigation if I remained as an undercover

24 and the defendant thought that I was under arrest with him or

25 if at that time I should let the defendant know that I was an

1  undercover agent.  So we didn't know how that was going to

2  play out.  So initially I was just arrested, fictitiously

3  arrested, to convince the defendant that I was still a

4  criminal.

5  Q    Did you ever actually transfer Bitcoin to the defendant

6  on April 30, 2019?

7  A    No.

8  Q    And did you ever actually receive the cash from the

9  defendant?

10  A    Yes.

11  Q    -- well -- in exchange?

12  A    Not an exchange but we did sees that cash that was in

13  the car that the defendant planned to exchange to me for

14  Bitcoin.

15         MS. KASSNER:  If we could pull up just for the

16  witness what's been previously marked as Government Exhibit

17  304 published to witness only.

18  Q    Let me know when you see it?

19  A    I see it.

20  Q    What is Government Exhibit 304?

21  A    This is a map of the broader New York area and on it --

22  displayed on the map are the locations, the general locations

23  all of the transactions that we just went through with the

24  defendant.

25         MS. KASSNER:  Permission to admit Government Exhibit

O-Kain - direct - Kassner                    369

1  304 into evidence and publish to the jury.

2              THE COURT:  Any objection?

3              MR. SINGER:  No, Your Honor.

4              THE COURT:  304 is admitted.

5              (Government Exhibit 304 received in evidence.)

6              THE COURT:  And you may publish.

7              (Exhibit published.)

8              (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

O'KAIN - DIRECT - MS. KASSNER                    370

1   BY MS. KASSNER:   (Continuing.)

2   Q    Are these all of the locations where you met the

3   defendant in 2018 and 2019?

4   A    Yes.

5            MS. KASSNER:  If we could show just to the witness

6   what has been previously marked as Government's Exhibit 1101.

7   Q    And if you could let us know when you see it on your

8   screen.

9   A    I see it.

10  Q    Do you recognize Government's Exhibit 1101?

11  A    I do.

12  Q    Did you review --

13           Let's start by asking, what is Government's

14  Exhibit 1101?

15  A    This is a summary chart of the transactions that I

16  conducted with the defendant and the amounts of BitCoin that I

17  provided.  The amount of cash that the defendant provided to

18  me and the commission that the defendant took for those

19  transactions.

20  Q    Did you review Government's Exhibit 1101 and ensure that

21  it accurately summarized the amounts you and the defendant

22  exchanged and the commissions that the defendant charged on

23  the listed dates in 2018 and 2019?

24  A    Yes.

25           MS. KASSNER:  Your Honor, I ask that Government's

1   Exhibit 1101 be admitted into evidence and published to the

2   jury.

3              THE COURT:  Any objection?

4              MR. SINGER:  No, Your Honor.

5              THE COURT:  1101 is admitted and you may publish.

6                        (Exhibit published.)
    Q    In total, how much BitCoin -- how much cash -- I'll ask
7   it this way.

8              In total, how much cash did the defendant provide to

9   you in exchange for the BitCoin you sent to him?

10  A    $133,190.

11  Q    During all of the times that you met with the defendant,

12  did he ever ask for your name?

13  A    No.

14  Q    Did he ever ask for a form of identification?

15  A    No.

16  Q    Did he ever ask for your date of birth or a driver's

17  license number?

18  A    No.

19  Q    Your social security number?

20  A    No.

21  Q    Did he ever mention anything -- I guess, did he ever ask

22  where you got the money from?

23  A    No.

24  Q    The BitCoin from?

25  A    No.

1  Q    And did he ever ask you to confirm that you got the

2  BitCoin from legal transactions?

3  A    No.

4          MR. SINGER:  One moment, Your Honor.

5          THE COURT:  All right.

6          MR. SINGER:  No further questions.

7          Thank you.

8          THE COURT:  Thank you very much.

9          Mr. Singer, cross examination.

10 CROSS-EXAMINATION

11 BY MR. SINGER

12 Q    Mr. O'Kain, good morning, sir.

13 A    Good morning.

14 Q    We never met before, correct?

15 A    Correct.

16 Q    So you just testified about the meeting that you had with

17 Mr. Goklu on April 30th of 2019, the day that he was placed

18 under arrest, correct?

19 A    Yes.

20 Q    And you indicated that you had made some statements to

21 Mr. Goklu about Adderall or pills, then you said that part of

22 the reason for that was because of the, I think, you said the

23 uncertain legality of surrounding marijuana in California; is

24 that right?

25 A    Yeah.  That's what I said.

1  Q     In 2018 and 2019, the growing and selling of marijuana in

2  licensed businesses was legal; was it not under California

3  law?

4  A     Under --

5  Q     California law.

6  A     California law.  You know, I know I knew this for certain

7  at one point.  I don't -- at this time, I don't exactly know

8  what the laws were.  I know there was some loosening of

9  restrictions on the sale of marijuana in the State of

10 California, but I do know that this was sold very legal

11 federally at that time.

12 Q     Thank you.  But that wasn't my question.  My question had

13 to do with the state laws in California.  There were legal

14 cannabis farms.  Farms where cannabis was being grown by

15 farmers for sale in state licensed dispensaries in California;

16 were they not?

17       Are you telling us that you are not aware of that?

18 A     I believe so.  I just explained my understanding.

19 Q     You believe that that is true, that farmers legally grew

20 marijuana on farms and sold it to licensed state licensed

21 dispensaries that were operating legally in the State of

22 California?

23 A     I believe that's correct.

24 Q     You know that's correct.  You were a DEA agent.  And you

25 know that was correct and you knew that it was correct in

1    April 30, 2019; didn't you?

2    A     It was several years sine I have been a DEA agent.  But

3    I'm sure at the time when I was a DEA Agent, I had a better

4    understanding of the intricacies of the legal status of

5    marijuana at that time.

6    Q     And, in fact, it's the same as what's happening now in

7    New York where the State is beginning to license dispensaries

8    for the legal sale of marijuana here, correct?

9    A     I have no idea what is happening with the status of

10   marijuana at this time.  Like I said, I'm not a special agent

11   anymore.

12   Q     You don't have to be a DEA Agent to read the news and be

13   aware of changes in the law.

14   ████████████████████████████████████████████

15   ████████████████████████████████████████████████

16   ██████████████████████████████████████

17           ███████████     ███████████████████

18   Q     And today, it's still -- marijuana to your knowledge, if

19   you know this, it's still illegal federally, correct?

20   A     Yes.

21   Q     Are you aware that in many states that marijuana is sold

22   under state law legally?

23           MR. SINGER:  Objection, Your Honor.

24           THE COURT:  I'll allow this one question.

25           If you know.

O'KAIN -  CROSS - MR. SINGER          375

1   A    I'm sorry, sir.  I don't follow the drug laws now.  I

2   clearly don't have time for that.

3   Q    So after -- well, after you told Mr. Goklu in this

4   April 30th meeting, that about marijuana is -- or that you

5   were selling pills or whatever, Mr. Goklu came back and asked

6   about buying a cannabis farm in California, correct?

7   A    Yes.

8   Q    Even after you told him that this was not -- that

9   federally it was illegal.  He's still talking about a legal --

10  what you understood him to mean was a legal cannabis farm in

11  California?

12  A    I would have to go back to the transcript to see the

13  sequence of the conversation.

14  Q    Then a little bit after that, Mr.-- you indicated to

15  Mr. Goklu something to the effect that there were different

16  laws in and out -- inside and outside of California regarding

17  marijuana; is that right?

18  A    I think I said that a friend of mine was arrested because

19  it was federally illegal and he was arrested by the Feds.

20  Q    Well, you told us in your testimony just a few moments

21  ago, that your understanding of what Mr. Goklu was saying to

22  you was that Mr. Goklu was aware that there were different

23  laws inside and outside of the State of California; is that

24  right?

25  A    I think more accurately, the defendant was letting me

O'KAIN -  CROSS - MR. SINGER                 376

1    know he was aware that it was -- you could get in trouble

2    outside of California.

3    Q    Selling marijuana, correct?

4    A    Yes.

5    Q    Was Mr. Goklu selling marijuana to you during any of

6    these transactions?

7    A    No.

8    Q    Were you selling marijuana to Mr. Goklu during any of

9    these transactions?

10   A    No.

11   Q    Was there any discussions about sale of marijuana outside

12   of California in any of these conversations?

13   A    I'd have to go back.  Again, I don't necessarily think it

14   was specifically stated that marijuana sales were occurring

15   outside of California.

16   Q    The discussions that you had with Mr. Goklu had do with

17   the growing and sale of marijuana in the State of California;

18   would you agree with that?

19   A    Part of our discussions were about that.

20   Q    All right.  So let me step back a bit.

21         Other than the text that have been introduced into

22   evidence and these are the signaled texts between you and

23   Mr. Goklu that led up to each one of the meetings that you had

24   with him.  And the recordings that were made of your meetings

25   with him.

1    There were no other communications with Mr. Goklu,
2  correct?
3  A    That's correct.
4  Q    And you had initially found Mr. Goklu on the
5  localbitcoins.com website, correct?
6  A    That's correct.
7  Q    And that site, localbitcoins.com, is it still operating
8  today?
9  A    I have not checked.
10 Q    Now, at the time that you determined that you were going
11 to reach out to Mr. Goklu, you did so because you suspected
12 that he might be involved in laundering drug money, correct?
13 A    Correct.
14 Q    That's why you selected him from other people that were
15 advertising on the localbitcoins site, correct?
16 A    That was -- the investigation started to identify if that
17 theory was correct.  Why we selected the defendant was because
18 of the larger amounts that he was advertising his ability to
19 transact that was sort of the primary reason.
20 Q    Okay.  But again, it was a suspicion that you had based
21 on the information you saw on the website?
22 A    Yeah.  So we -- like I testified to earlier, from other
23 unrelated DEA investigations, we became aware that money was
24 being laundered -- drug money was being laundered through
25 localbitcoins.com.

O'KAIN -  CROSS - MR. SINGER            378

1   Q    Understood.  That's why you went looking at that website.

2        But at the time you and your fellow agents decided

3   on that you would focus some attention on Mr. Goklu, it was a

4   suspicion that you had; is that right?

5   A    Sure.

6   Q    You didn't have any affirmative evidence or proof that

7   Mr. Goklu was laundering drug money; did you?

8   A    No.

9   Q    So you went into your meetings with Mr. Goklu for the

10  purpose of determining whether the suspicions would be borned

11  out?

12  A    Correct.

13  Q    And if you had determined that, at any point, they were

14  not borned out, you would of dropped your interest in

15  Mr. Goklu and gone looking for someone else who you were

16  suspicious of?

17  A    That's correct.

18  Q    Now, each meeting that you had with Mr. Goklu, and there

19  were seven of them, right?

20  A    Correct.

21  Q    From August through April.  August of 2018 to August of

22  2019, there were seven meetings, right?

23        And each time the meeting was essentially the same

24  to the extent that Mr. Goklu brought cash, right?

25  A    Um-hmm --

1   Q    You have say yes or no for the record.  I'm sorry.

2   A    Yes.

3   Q    Mr. Goklu would count out the money.  You'd agree on an

4   amount and Mr. Goklu would count out the money, right?

5   A    Yes.

6   Q    You would agree on the fee that he was charging?

7   A    Yes.

8   Q    You would then initiate the transfer of BitCoin to

9   Mr. Goklu, correct?

10  A    Yes.

11  Q    And then, each time you had to wait for the BitCoin

12  transfer to take place; is that right?

13  A    Yes.

14  Q    And sometimes that transfer and the confirmation that you

15  would receive would happen quickly and sometimes it would drag

16  on for awhile?

17  A    Correct.

18  Q    Maybe a half an hour, 45 minutes, something like that?

19  A    Correct.

20  Q    But each time, I think the longest meeting would have

21  been up to an hour, you walked away with the cash and he

22  received the BitCoin, right?

23  A    Yes.

24  Q    And in each one of the transactions, the -- Mr. Goklu was

25  receiving a fee, right?

1   A    Yes.

2   Q    He was making money on each one of the transactions?

3   A    Yes.

4   Q    Now, the BitCoin that Mr. Goklu was receiving from you,

5   it varied in price from day-to-day, correct?

6   A    Yes.

7   Q    And in fact, the first meetings that you had the rate,

8   the BitCoin rate, exchange rate, was something over $7,000 per

9   BitCoin; is that right?

10  A    I would have to go back and check, but --

11  Q    Well, on the reports that you verified and are in

12  evidence.

13           THE COURT:  You want to pull up 1101.

14           MR. SINGER:  No.

15           THE COURT:  The summary of the docket.

16           MR. SINGER:  It doesn't have the information, Judge,

17  one moment.

18           THE COURT:  I'm sorry.  It didn't have the rate.

19           MR. SINGER:  We'll start with Government's Exhibit

20  -- I think it's one actually.

21           Ms. Sahli, if you could pull up Government's

22  Exhibit 1.  Actually, Government's Exhibit 7.  I think they're

23  not in date order.

24           THE COURTROOM DEPUTY:  Previously admitted.

25  Q    All right.  Mr. O'Kain, you see this is the -- you

O'KAIN -  CROSS - MR. SINGER                 381

1    indicated was the photo of the transaction receipt from

2    August 28th of 2018, correct?

3    A    Yes.

4    Q    And on that receipt it indicates the exchange rate at the

5    time?

6    A    Correct.

7    Q    That was the exchange rate for one BitCoin; is that

8    correct?

9    A    Yes, correct.

10   Q    It was $7,114.57?

11   A    Correct.

12        MR. SINGER:  Can we jump to the December 11th.  The

13   screen is not working.

14        THE COURTROOM DEPUTY:  Hold on.

15        Exhibit 3, previously admitted.

16   Q    Okay.  You are able to see this exhibit?

17   A    Yes.

18   Q    And this was from the photo of the transaction receipt

19   from December 11, 2018, correct?

20   A    Correct.

21   Q    And the exchange rate at this time was 3,000 --

22   $3,342.33, correct?

23   A    Correct.

24   Q    So less than half of the exchange rate in August?

25   A    Correct.

1  Q    And, in fact, Mr. Goklu indicated to you during the

2  course of some of these transactions that he had actually lost

3  money in the some of the transactions with you because of the

4  change in the price of BitCoin?

5  A    He did.

6  Q    But in each one of the transactions, each time you met

7  with him, he was making some money from the fee?

8  A    Correct.

9  Q    And losing money if the value of the BitCoin dropped?

10 A    Correct.

11        MR. SINGER:  Thank you, Ms. Sahli.  I don't need

12 that anymore.

13 Q    Now, you indicated that your cover story as an undercover

14 officer was that you were an online drug dealer selling drugs

15 online in exchange for BitCoin, correct?

16 A    Correct.

17 Q    Now, in the text, the Signal text messages that you sent

18 to Mr. Goklu, you never indicated to him that that's who you

19 were and what you were doing, correct?

20 A    Well, I --

21 Q    Did you ever tell him that you were selling drugs

22 directly?

23 A    Yes.

24 Q    In the text messages?

25 A    No, not in the text messages.

1  Q    Okay. So nothing ever came up in the text messages?

2  A    No.

3  Q    And when you first met with Goklu on -- Mr. Goklu on

4  August 28th of 2018, you didn't tell him that you were selling

5  drugs?

6  A    Correct.

7  Q    Or that your business was selling drugs and the BitCoin

8  that you were seeking to exchange was from the sale of drugs;

9  is that right?

10  A    That's correct.

11  Q    And you didn't tell him that on September 21st of 2018,

12  correct?

13  A    That's correct.

14  Q    And you didn't tell him that in November of 2018; did

15  you?

16  A    I did not.

17  Q    And you started to hint at it a little bit in December --

18  on December 11th of 2018?

19  A    Yes.

20  Q    And that was the first time?

21  A    Correct.

22  Q    So prior to the December 11th meeting, was there any

23  basis -- based on anything that you had told to Mr. Goklu, was

24  there any reason for him to believe that you were selling --

25  that the BitCoin that you were exchanging with him was from

1   the sale of illegal drugs?

2   A    Can you repeat that question?

3   Q    Well, I'll state it affirmatively.

4              There was no information that you had provided to

5   Mr. Goklu in those first four conversations that would lead

6   him to believe that the BitCoin had been obtained from selling

7   illegal drugs; isn't that correct?

8   A    Yeah.  Not necessarily.

9   Q    Not necessarily?

10  A    He would -- I think if you could state that a different

11  way.  Well, I guess, I did not specifically state anything

12  about drugs during those interactions, that's correct.

13  Q    Well, in fact, you testified -- I think it was yesterday

14  or maybe on Monday afternoon -- that Tuesday or Monday

15  afternoon, that people -- well, the prosecutor had asked you

16  whether you said anything in that first meeting about drugs

17  and your answer was that people that are involved in the drug

18  business don't talk about it openly; is that right?

19  A    That's correct.

20  Q    Right.  The first rule of fight club is that you don't

21  talk about fight club, right?

22  A    So the movie goes.

23  Q    So the movie goes.

24             And that's essentially is what your sayings, is the

25  cultural of people who are involved in buying or selling or

O'KAIN - CROSS - MR. SINGER                385

1   laundering money from drugs, that people involved in to don't

2   talk about it directly.

3          That's your experience as an undercover officer with

4   the DEA?

5   A    Yes.

6   Q    And is that -- it's not a rule.  Would it be fair to call

7   it a custom or practice of people who are involved in illegal

8   drug transactions?

9   A    Yeah.  I think it would be -- and this is based on my

10  experience when I was at the DEA.  It would be highly

11  irregular for two individuals that don't know each other to

12  openingly discuss any illegal things that they are doing.

13  Q    Well, I understand that.  That's what you testified to

14  and that is sort of a practice or custom that was understood

15  for people who are involved in the drug business, correct.

16  A    That's correct.

17  Q    Again, that's based on your experience that people in the

18  drug business kind of knew that you don't talk about it

19  openingly, right?

20  A    That's correct.

21  Q    And you said that's why you didn't talk about it or

22  didn't raise that in your first meeting with Mr. Goklu?

23  A    That's correct.  And also it would be -- it would just be

24  out of character.

25  Q    It would be out of character for someone who is involved

1    in the drug business?

2    A    That's correct.

3    Q    And people in the drug business know that, right?

4    A    I believe so, yes.

5    Q    And people that are not part of the drug business would

6    have no reason to know that, correct?

7    A    Perhaps.

8    Q    But in the first meeting with Mr. Goklu, on three

9    separate occasions Mr. Goklu started talking about drug

10   dealing, right?

11   A    Yes.

12   Q    Did that -- withdrawn.

13        He told you right when you got into the car and he

14   asked you to close the door, he says, we're not drug dealers,

15   right?

16   A    He did say that.

17   Q    And then, a short while later when referring to security

18   cameras on buildings that were nearby, he -- what he said was

19   what someone who was viewing the cameras if they came to the

20   car might say, Hey, are you a drug dealer, right?

21        That's what he said to you in that meeting?

22   A    I'm sorry, what's your question though?

23   Q    He said that to you, correct?

24   A    He said --

25   Q    Hey, are you a drug dealer?  Meaning, someone who would

O'KAIN - CROSS - MR. SINGER                387

1    view the security cameras and come over to the car?

2    A    Yeah.  Something to that effect.  Sure.

3    Q    And he also reference the money counting machine and said

4    that the police might view a money counting machine as being

5    evidence that you're a drug dealer, right?

6    A    Yes.

7    Q    So three times the person that -- Mr. Goklu, in your

8    first meeting with you references drug dealing, correct?

9    A    He references drug dealing.  I don't know if that was

10   three times.

11   Q    Yes.  He did three times.  Right?

12   A    I would have to go back.  I remember him saying it once

13   and then implying other things or not necessarily directly

14   implying.

15   Q    I'm not playing the tapes.  The jury can listen to the

16   recordings.

17          So didn't this -- I guess, the unusual aspect of

18   Mr. Goklu openingly referencing drug dealing to you in your

19   first meeting, didn't that offer you an opportunity to try to

20   hint to Mr. Goklu that in fact your business was selling

21   drugs?

22   A    At that time, no.

23   Q    It didn't offer you that opportunity?

24   A    No.

25   Q    You could have said something?  Was there anybody

O'KAIN -   CROSS - MR. SINGER          388

1   muzzling you?

2           You could have suggested in some way to Mr. Goklu,

3   laughed about it, or something to try to convey to Mr. Goklu

4   that in fact that that's what you were involved with and you

5   chose not to?

6   A    I chose not to.

7   Q    Yes, but you could have.

8   A    I chose not to --

9   Q    But you could have.  Please listen to my question, not

10  what you want to say.

11          You could have?

12  A    I could have said a lot of things and I chose to say what

13  I did.

14  Q    Now, couldn't you have possibly saved you and your fellow

15  agents a lot of time if you would have somehow suggested to

16  Mr. Goklu when he raises the issue of drug dealing, if you

17  would have somehow suggested to him that's what you were

18  involved in and he either would have gone along, and in which

19  case you would have had a real solid ground for continuing

20  your investigation or made clear to you, I don't deal with

21  that, and you could have stopped your focus on him and gone

22  onto someone else.

23          You could have done that, correct?

24  A    That could potentially have out of the infinite scope of

25  things I could have said, sure, but at that time I --

1    Q     You didn't.

2    A     The reason --

3    Q     Thank you.  You've answered my question, sir.

4          Now, Mr. Goklu repeated concerns to you about the

5    police?

6    A     Yes, correct.

7    Q     And he also told you why he was concerned about the

8    police; didn't he?

9    A     Yes.  He didn't want to get caught doing something

10   illegal.

11   Q     Well --

12   A     That's how I --

13   Q     That's not quite.

14   A     That's how I understood it.

15   Q     Okay.  I'm not interested in your interpretations, sir.

16   I'm interested in what he may have said to you.

17          Now, isn't it a fact that he expressed to you that

18   if police found two people in a car with a large amount of

19   cash and a money counting machine, they would -- the police

20   would believe that you are doing something illegal; whether

21   you are or not, correct?

22   A     That's what you understood, yes.

23   Q     And if the police saw something that they thought might

24   be illegal, they would seize first and ask questions later,

25   right?  Isn't that what he was expressing to you?

1  A    I don't think that I understood it that way at the time.

2  Q    Well, Mr. Goklu told you -- expressed to you at various

3  times that he understood that if money was seized from him

4  that he would get the money back; didn't he?

5  A    Yes.

6  Q    And that the police would seize the money, possibly the

7  money counting machine, and possibly even the BitCoin,

8  correct?

9  A    Correct.

10 Q    And that essentially it would be an enormous

11 inconvenience and you'd be without the money for sometime

12 until you were able to get it back, right?

13 A    I don't know if that ever was articulated.

14 Q    Well, do you recall him on November 27th of 2018, telling

15 you that he wasn't concerned about jail, we're not talking

16 about jail, but that the police would keep the money for days.

17 A    Yeah.

18 Q    Do you recall him telling you that?

19 A    He expressed concern about the money being seized.

20 Q    No.  That's not my question.

21       He told you that it's not jail.  He's not concerned

22 about jail.  He's concerned about the money being taken away

23 from him.  At that point he said for days.

24 A    Okay.  You know, I just want --

25 Q    You don't recall?

1  A    I want to make sure I'm answering accurately.

2          MR. SINGER:  Ms. Sahli, could you play that portion

3  from November 27th.

4          THE COURTROOM DEPUTY:  Which exhibit?

5          MS. SAHLI:  803.

6          THE COURTROOM DEPUTY:  I'm sorry, which one?

7          THE COURT:  803.

8          Do you want to refer to the jury to the transcript?

9          MS. SAHLI:  Page 15 in the transcript.  The full

10  transcript at the back of your binder.

11          THE COURT:  Ladies and Gentlemen, if you note, which

12  is where I was before.  At the back of your binder, you have

13  the full transcripts or transcripts of the fuller portions of

14  the recordings and they don't have an R.  And so, if you look

15  at 803, apparently Ms. Sahli is saying that you should start

16  at Page 15; is that right?

17          Did you say, Ms. Sahli, 15?

18          MS. SAHLI:  Yes, Page 15.

19          THE COURT:  Of transcript 803.

20          And the timestamp is?

21          MS. SAHLI:  27:52.

22          THE COURT:  Starting at 27:52.  Thank you.

23                  (Audio recording played.)

24                  (Audio recording stopped.)
   Q    So Mr. O'Kain, Mr. Goklu in fact told you it's not jail,

25  correct?

Shernelle Griffith - Official Court Reporter

O'KAIN -   CROSS - MR. SINGER                     392

1   A     That's right.

2   Q     And the police are going to keep your money two or

3   three days?

4   A     That's correct.

5   Q     That's what he expressed to you as his concern about the

6   police seeing what the two of you were doing in the car,

7   right?

8   A     Correct.

9   Q     Okay.  And on January -- yes.

10          On January 24th of 2019, Mr. Goklu indicated to you

11  that it could take a year to get your money back; didn't he?

12          Do you remember that?

13  A    I recollect that.  I believe it.  I just want to -- when

14  I -- I just want to make sure I'm answering the questions

15  accurately.

16  Q    Well, the question is very specific.  Did Mr. Goklu tell

17  you on January 24th of 2019 in relation to the money being

18  seized by the police that they keep your money -- that it

19  could take a year to get your money back?

20  A     I believe so.

21  Q     You believe so.

22          MR. SINGER:  Ms. Sahli, could we play the segment

23  from January 24th and this is in -- what's the exhibit?

24          MS. SAHLI:  Government's Exhibit 806 already in

25  evidence.

Shernelle Griffith - Official Court Reporter

1           MR. SINGER:  The full 806, not 806R.  The full 806
2    towards the back.
3           MS. SAHLI:  Starting at Page 10, 22:46.
4                     (Audio recording played.)
5                     (Audio recording stopped.)
6    Q    In fact, Mr. O'Kain, Mr. Goklu told you in relation to
7    the possible seizure of money by the police that it could take
8    a year to get it back; is that right?
9    A    That's correct.
10   Q    And he repeated essentially the same concern to you on a
11   number of occasions, that he was expressing to you, that's why
12   he did not want to transact -- do the transactions in
13   Manhattan and why he was concerned about other people that
14   might see what the two of you were doing in the car; is that
15   right?
16   A    Yeah, that's correct.
17   Q    Okay.
18   A    That's part --
19   Q    And it was again --
20   A    -- of the investigation.
21   Q    And I'm not talking about your belief?
22          THE COURT:  So you said you're not talking about his
23   belief.  Go on.
24   Q    We're talking about the -- these are things that
25   Mr. Goklu expressed to you as the reasons why he didn't want

1  to police to see what the two of you were doing in the car?

2  A    That's correct.

3  Q    All right.  And he never said to you, I don't want the

4  police to see what's going on in the car because I'm concerned

5  that I'm going to be arrested and get charged with some drug

6  offense.

7         He never said that to you or anything like that to

8  you, correct?

9  A    No.

10 Q    He was concerned about the seizure of the money for

11 whatever period of time it would take before he was able to

12 get it back; is that right?

13 A    Exactly.  He was concerned about the money being seized.

14 Q    Seized.

15 A    Um-hmm --

16 Q    And he never expressed concern that he would not be able

17 to get it back.  It would just take some time to do so, right?

18 A    I believe so.

19 Q    Now, you indicated that on Tuesday as you were on direct

20 examination, as you were going through each one of meetings

21 with Mr. Goklu, that you took opportunities to try to convey

22 or hint to Mr. Goklu what your business actually was in terms

23 of your cover story, right?

24 A    That's correct.

25 Q    And you testified, I believe, that the -- one of the

1    reasons that you did that was to try to get Mr. Goklu to ask

2    questions, correct?

3    A    That's correct.

4    Q    Which would give you an opportunity to more clearly state

5    what your cover story business was?

6    A    And to give the defendant an opportunity to have any sort

7    of inclination on whether this money was legitimate or

8    illegitimate.

9    Q    And repeatedly, Mr. Goklu simply did not respond; is that

10   right?

11   A    That's correct.  It did not seem that he cared one way or

12   cared.

13   Q    Well, again, you're not a mind reader; are you?  And what

14   you're giving us is just your opinion about his reaction.

15        I'm asking specifically, factually, he didn't

16   respond to these efforts that you were making to raise -- to

17   get him to raise questions?

18   A    No.  He didn't respond at all.

19   Q    Now, during the meetings, as soon as you would get in the

20   car with him, the recordings indicated that you immediately

21   started talking about the money, correct?

22   A    Correct.

23   Q    And Mr. Goklu would right at the beginning of your

24   meeting, take out the cash however he had it that day, bundles

25   tided up, envelopes, whatever it might be, correct?

O'KAIN - CROSS - MR. SINGER                    396

1   A    Correct.

2   Q    And started running the money through the money counting

3   machine to make sure for both of you that the amount that was

4   being given to you was correct; is that right?

5   A    Correct.

6   Q    So the first part of the meeting is making sure that the

7   cash part was correct, right?

8   A    Typically, yes.

9   Q    Well, each time?

10  A    Yeah.

11  Q    Each time you did a transaction, August 28, September

12  21st, November 27th, December 11th, January 24th, January

13  30th --

14            THE COURT:  Hey.  Sorry.  Please, you got to listen

15  to me when I call out to you.  You got to go slower for the

16  court reporter.

17            Shernelle, where did you leave off?

18            MR. SINGER:  I'll withdraw it.

19            THE COURT:  You're withdrawing it.

20            MR. SINGER:  I'll withdraw that and state it again.

21  Q    In the six times that you conducted cash for BitCoin

22  transactions with Mr. Goklu, that's how the meeting started;

23  is that right?

24  A    That's correct.

25  Q    All right.  And then, I'm excluding the April 30th

1  because it was not actually an exchange of BitCoin on that
2  date?

3  A    Correct.

4  Q    All right.  So the meeting starts with Mr. Goklu focusing
5  on the cash, correct?

6  A    Correct.

7  Q    Focusing on the exchange rate, right?

8  A    Yes.

9  Q    How much BitCoin you had to sell that day?

10  A    Correct.

11  Q    How much cash that would convert into, correct?

12  A    Yes.

13  Q    And then, what the fee -- his percentage fee would be
14  seven or eight percent, whatever it was?

15  A    Yes.

16  Q    To make sure that the cash being provided to you was the
17  correct amount for the exchange that you were doing, right?

18  A    Correct.

19  Q    And so, the first part of the meeting, Mr. Goklu, is
20  focused on that and is engaged in doing that, correct?

21  A    Yes.

22  Q    And then, you would -- once that was resolved, you would
23  then initiate a transfer of BitCoin from the wallet in your
24  phone; is that right?

25  A    Correct.

1  Q    And there would be some discussion, and it's in the

2  recordings, you would discuss the transfer -- how much BitCoin

3  you were transferring, correct?

4  A    Correct.

5  Q    And then, you would stay in the car with Mr. Goklu until

6  that transactions was confirmed, right?

7  A    Yes.

8  Q    And the confirmation was not on your phone.  It was on

9  Mr. Goklu's phone; is that right?

10 A    That's not necessarily correct based on how the BitCoin

11 blockchain worked.  So the confirmations --

12 Q    Well, was Mr. Goklu looking at your phone to get

13 confirmation or was he looking at his own phone to get

14 confirmation that the BitCoin had been transferred to him?

15 A    He was looking at his phone.

16 Q    Okay.

17 A    But again.

18 Q    Well, I'm asking what he was doing.  He was looking at

19 his phone, correct?

20 A    That's correct.  He was looking at his phone.

21 Q    Okay.  And again, the -- we're talking about populating

22 the blockchain and all of that, right?  But those are the

23 electronic steps that had to happen, not in the car, but out

24 in the ether somewhere until the confirmation would come to

25 Mr. Goklu; is that right?

1  A    That -- yeah.  And -- yes.  That's for all intensive

2  purposes, that's right.

3  Q    Okay.  And you were not going to leave and he certainly

4  wanted you to stay in the car until the confirmation was

5  received, that he had received the BitCoin; is that right?

6  A    That's correct.  It was a certain number of -- there are

7  multiple confirmation.  And like I mentioned before, the more

8  confirmations that occur on the blockchain, the more

9  solidified that transaction is solid and the money is in his

10  account, so yes.

11  Q    So at that point, Mr. -- in each one of the transactions,

12  Mr. Goklu had given you the cash, right.

13  Q    Or it was sitting there for you to take?

14  A    Yeah.  Exactly.

15  Q    That it had been counted out and segregated from any

16  money he had and it was sitting there in the car for you to

17  take?

18  A    Correct.

19  Q    And the meeting that the -- you were not going to take

20  the cash until Mr. Goklu was satisfied by whatever

21  confirmations there were, however many there would have been,

22  you weren't going to leave until Mr. Goklu was satisfied that

23  the confirmations were sufficient for him?

24  A    That's correct.

25  Q    Okay.  (Continued on the following page.)

O'KAIN - CROSS - MR. SINGER                    400

1   CROSS-EXAMINATION (Continued)

2   BY MR. SINGER:

3   Q   Okay.  And those confirmations, as I asked you a little

4   bit earlier, could come quickly or they could take some time,

5   correct?

6   A   Correct.

7   Q   And during the entire time while you're waiting,

8   Mr. Goklu is looking at his phone; is that right?

9   A   I can't recall specifics about how frequently he looked

10  at his phone.

11  Q   Well, the only place that Mr. Goklu was going to receive

12  the confirmations that he sought was by information that came

13  up on his phone; is that right?

14  A   Correct.

15  Q   And so whether he was staring at it 100 percent of the

16  time or whether he simply kept going back to it to see what

17  was going on or to refresh the phone, that's what he was

18  doing, correct?

19  A   Correct.

20  Q   And it was during that time that he's waiting for the

21  confirmations that you are talking to him about your cover

22  business; is that right?

23  A   Correct.

24  Q   You said you needed money for California and he didn't

25  ask any questions about that?

1   A    Correct.

2   Q    You said that, you know, the amount of money that -- or

3   the BitCoin that you'd be able to bring to him was depending

4   on how much we sell, and he never responded to that?

5   A    That's correct.

6   Q    You asked him about -- or you spoke on your cell phone

7   with your supposed partner about keys, correct?

8   A    That's correct.

9   Q    And Mr. Goklu didn't respond to that in any way?

10  A    That's correct.

11  Q    What's a key, what are you talking about, does this have

12  to do with me; he didn't say anything, right?

13  A    That's correct.  He said nothing.

14  Q    And you said that keys refer to cocaine and heroin.

15       That's how cocaine and heroin are sold?

16  A    Yes.  That's correct.

17  Q    Was there ever any discussion with Mr. Goklu about

18  cocaine or heroin?

19  A    No.  Outside of me referencing keys, no he did not

20  reference --

21  Q    Well, again, keys are something that someone in the drug

22  business would be expected to understand; is that right?

23  A    That is accurate.

24  Q    And someone who's not involved in the drug business would

25  not necessarily know what the heck you were talking about,

1   right?

2   A    Not necessarily.  I think it's pretty common, based on

3   movies and popular culture.

4   Q    So everybody knows that a key refers to cocaine and

5   heroin?

6   A    That a question?

7   Q    Is that what you're saying?

8   A    Does everyone know?  I'm not sure if everyone knows.

9   Q    Of course you don't.

10         You made a reference to getting your head chopped

11  off; he didn't respond?

12  A    No.

13  Q    You made a reference to not being able to touch CoinBase

14  and he didn't respond?

15  A    Not at all.

16  Q    Then on January 24th, you make some reference to oxy?

17  A    That's correct.

18  Q    And he did respond to that, right?

19         He asked you, what's oxy?

20         He didn't even know what you were talking about; is

21  that right?

22  A    He asked what oxy was.

23  Q    He said, what's oxy.

24         That's the specific words that he used to you,

25  what's oxy, right?

1   A    That's correct.

2   Q    And you simply gave him the full name, oxycodone, right?

3   A    That's correct.

4   Q    He didn't ask any other questions about that, what's

5   that, what are we talking about?

6   A    No.

7   Q    No indication that he knew what you were talking about?

8   A    He --

9   Q    You assumed that everybody should know what you're

10  talking about, but he never said anything; is that right?

11  A    He never asked any questions after I told him that it was

12  oxycodone.

13  Q    That's correct.

14           Now, you testified that on one of your earlier

15  meetings with Mr. Goklu that Mr. Goklu had said that he had

16  done a transaction with someone who was selling marijuana; is

17  that right?

18  A    That's correct.

19  Q    And that was actually on November 27th of 2018, where

20  Mr. Goklu raised that, correct?

21  A    I believe so, yes.

22  Q    And again, that wasn't in response to any hint or

23  suggestion from you that was trying to bring that information

24  out of him, this was something that he simply went into on his

25  own; is that right?

1  A    That's correct.

2  Q    And is that all he said, that he was doing a transaction

3  with somebody selling marijuana?

4  A    I don't think that portion was played in court, so I'd

5  have to get the actual specifics -- I'd have to refresh my

6  memory.

7  Q    Well, why don't we do that.

8  A    Sure.

9  Q    All right.

10         MR. SINGER:  November 27th, Ms. Sahli.

11         MS. SAHIL:  Yes, it's Government Exhibit 803, the

12 full transcript at Page 26, and then to play from timestamp

13 43:24.

14         THE COURTROOM DEPUTY:  43:24?

15         MS. SAHIL:  Yes, 43:24.

16         (Exhibit published.)

17         (Audio recording played.) (Audio recording stopped.)

18 Q    So Mr. Goklu, didn't simply reference that someone that

19 was selling marijuana in California, he said more than that,

20 didn't he?

21 A    Yes.

22 Q    In fact, what he said to you -- you had -- you responded

23 by indicating that you didn't understand what he was saying to

24 get him -- and he responded to that; is that right?

25 A    That's correct.

1  Q    And he said, it's a licensed marijuana thing in

2  California, right?

3           We just heard it.  Did you hear that?

4           Did you hear him say that it's a licensed marijuana

5  thing?

6  A    Yes.

7  Q    Okay.  And did you hear Mr. Goklu say that it was legal?

8  A    He did say that.

9  Q    And did you hear Mr. Goklu say that you pay taxes?

10 A    Yes.

11          THE COURT:  Mr. Singer, just so you know, we'll take

12 our morning break in about a couple of minutes.

13          MR. SINGER:  I will be done in about a couple of

14 minutes, so the timing will be perfect.

15          THE COURT:  Okay.  Thank you.

16 Q    You responded to Mr. Goklu that marijuana was also part

17 of your business, didn't you?

18 A    Yes.

19 Q    And that was immediately after Mr. Goklu referenced what

20 he stated was a licensed marijuana thing in California that

21 was legal and pays taxes, and you said that's part of my

22 business too?

23 A    Marijuana was part of my business, that's what I told

24 him.

25 Q    That's what the conversation was about, marijuana.

1        You said, that's part of my business too, right?

2   A    Correct.

3   Q    And then on April 30th, the day of the arrest, when you

4   first got into the car, there was -- this was not the seventh

5   time that you were meeting with him, right?

6   A    Correct.

7   Q    And were certainly more comfortable with each other?

8   A    Yes.

9   Q    And he -- Mr. Goklu begins by asking you, how's business,

10  right?

11  A    Yes.

12  Q    You told him it was booming?

13  A    Correct.

14  Q    And Mr. Goklu responds, like, you know, hey, I should get

15  into that, right?

16       If your business is booming, maybe I should get into

17  that, right?

18  A    Correct.

19  Q    And you answered, oh, you want a cut, you want to get

20  into it, right?

21  A    Correct.

22  Q    And then the business that he referenced that he wanted

23  to get into with you was a cannabis farm; is that right?

24       He asked you how much is a cannabis farm?

25  A    That's correct, and that's why I referenced --

1  Q    Sir, you answered my question.

2       When you offered him a cut of the business, what he

3  indicated to you -- what Mr. Goklu indicated to you was how

4  much it would cost to buy part of a cannabis farm; isn't that

5  right?

6  A    That's correct.

7  Q    Thank you.

8       MR. SINGER:  I have nothing else.

9       THE COURT:  All right.  Thank you.

10       Timing is perfect.  Let's take our morning break,

11  folks.  It's 11:15, thereabout.  Let's be ready to go at 11:30

12  or a minute or two after.

13       Have a good break.  Keep an open mind.  Do not talk

14  about the case or don't do any research.

15       THE COURTROOM DEPUTY:  All rise.

16       (Jury exits the courtroom.)

17       ████████████    ████████████    ██████████████████

18  ████████████

19       ████████████████████████████████████████████████████

20       ████████████████████████

21       (Jury enters the courtroom.)

22       THE COURT:  So jurors -- by the way, you can sit.

23  We stand for you, but you can sit.

24       So welcome back.  Have a seat, everyone.

25       Ms. Kassner, your witness for redirect.

1        MS. KASSNER:  Thank you, Your Honor.

2    REDIRECT EXAMINATION

3    BY MS. KASSNER:

4    Q    On cross-examination -- excuse me.

5        On cross-examination, defense counsel asked you a

6    few questions about the drug business.

7        Do you recall that?

8    A    Yes.  I do.

9    Q    Is money laundering part of the drug business?

10   A    Yes.

11   Q    And in your training and experience, as a former Drug

12   Enforcement Administration agent, is it possible to run a

13   successful drug operation without money laundering?

14   A    No.  Money laundering was typically always part of the

15   scope of circumstances around drug dealing.

16   Q    You were also asked some questions about marijuana.

17       Was marijuana a controlled substance under federal

18   law in 2018?

19   A    Yes, it was.

20   Q    Is it still a controlled substance under federal law

21   today?

22   A    It still is.

23   Q    Has marijuana ever been legal to distribute in the United

24   States under federal law?

25   A    Not to the best of my knowledge.

1   Q     You were also asked about selling marijuana outside the

2   State of California.

3           Do you remember that?

4   A     Yes.

5   Q     And I'd like to refer you to Jury Aid 801 which is the

6   full transcript, on Page 11.  And near the bottom of Page 11,

7   transcript 801 -- not the one with the R, but the full one at

8   the back -- you say that you have an online business.

9           Do you recall what you told the defendant about your

10  business?

11  A     At that time, I believe it was just generic, an online

12  business.

13  Q     And if we now turn to page -- transcript of 806.  It's a

14  few tabs over.  On Page 13?

15          MR. SINGER:  Your Honor, if I may, the jury aids are

16  not in evidence.

17          THE COURT:  I'm sorry, what's not in evidence?

18          MR. SINGER:  The jury aids are not in evidence.

19          THE COURT:  Right.  I'm sorry, so what was the

20  request, to have the jury just read the transcripts?

21          You do have to play the audio.  You can't just have

22  them read the transcripts.

23          Is that what's being proposed?

24          MR. SINGER:  That was my concern, Your Honor.

25          THE COURT:  So just play the audio again, because

O'KAIN - REDIRECT - MS. KASSNER                410

1   remember, the transcripts are simply aids to what they hear on

2   the audio.

3           The audio is the evidence.

4           MS. KASSNER:  Yes, Your Honor.

5           For this question, I'm not asking to play the

6   transcripts.  I'm asking what the witness recalls saying to

7   the defendant based on reviewing the transcript.  But I can

8   also just ask him what he recalls.

9           THE COURT:  Ask him what he recalls.  If he has a

10  failure of memory, you can refer him to the transcript.  But

11  he would read it to himself then, and don't refer the jury to

12  look at it.

13          MS. KASSNER:  Okay.

14  Q   Mr. O'Kain, what, if anything, did you tell the defendant

15  about where you sold the product --

16          THE COURT:  Mr. O'Kain, close your binder, listen to

17  the question, do you recall, and then go ahead.

18  Q   Mr. O'Kain, do you recall telling the defendant where you

19  sold the products that your business was selling?

20  A   Vaguely.  It would help if I could refresh my memory.

21  Q   Would it refresh your recollection to look at a

22  transcript dated January 24, 2019?

23  A   Yes.

24  Q   Okay.  And if you could look at, in your binder, tab 806,

25  Page 13.

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

1          THE COURT:  Just read it to yourself, and jurors,

2     don't open your binders.

3          Go ahead.  Just let the AUSA know what you're ready.

4     A     Can you please tell me the page number again.

5     Q     Page 13.

6     A     Okay.

7     Q     Did that refresh your recollection as to where you told

8     the defendant you sold your products?

9     A     Yes.  I told the defendant that we got our stuff from

10    California and brought it back here, meaning, New York.

11    Q     In your training and experience, do drug dealers usually

12    write in text messages, I'm selling drugs?

13    A     No.

14    Q     During your -- and in your training and experience, do

15    drug dealers typically call drugs, drugs?

16    A     No.  They typically don't.  They call them anything about

17    the actual name for the drugs.

18    Q     During your time as a Drug Enforcement Administration

19    agent, how many times did you see or hear anybody say, I'm

20    dealing drugs?

21    A     I can't remember any times that that happened.

22    Q     And earlier, it was -- there was a discussion of the fact

23    that you never said, I'm dealing drugs.

24          Why didn't you say that?

25    A     Because that would be completely out of character with

1   somebody that is selling drugs.  And as I was operating in an

2   undercover capacity with a cover story that I was selling

3   drugs, I hug to the cover story as best I could, and part of

4   that was not actually stating so bluntly that I'm selling

5   drugs.

6   Q    In January and April of 2019, did you tell the defendant

7   that you were selling Adderall?

8   A    Yes.

9   Q    And did you tell the defendant that you were selling

10  marijuana?

11  A    Yes.

12  Q    And did you tell you the defendant you were selling

13  oxycodone?

14  A    Yes.

15  Q    Now, I want to pull you up the section where you told --

16          MS. KASSNER:  So I want to play, if we could, a

17  portion of the transcript.  And this is Government

18  Exhibit 806.  And if we could play 41:35 until 43:30.

19          And this is going to be in the binders, 806, Page

20  25, in the long version of the transcript.  It might go a bit

21  before and a bit after.

22  A    I'm sorry, before that plays, can you give the page

23  number one more time.

24  Q    Yes.  It's Page 27 of tab 806, the full tab that has the

25  page numbers at the bottom.  And the recording may start a bit

O'KAIN - REDIRECT - MS. KASSNER            413

1    before this page.

2              (Audio recording played.)

3              MS. KASSNER:  If we could pause here.

4              (Audio recording stopped.)

5    Q    So earlier there was a discussion about whether or not

6    the defendant responded when you said that oxies refer to

7    oxycodone.

8              Did the defendant respond when you said that?

9    A    Yes, he did.

10   Q    And what did he say?

11   A    He said don't bring those expensive things.

12   Q    Did he say anything else?

13   A    And he said then just bring regular street things.

14   Q    After you told the defendant that you sold Adderall,

15   oxycodone, and marijuana, did the defendant refuse to exchange

16   your BitCoin?

17   A    No.

18   Q    Now, I want to turn back to one last thing.

19              Do you recall being asked questions about the

20   defendant not wanting money to be seized?

21   A    Yes.

22   Q    Now, earlier, we listened to Government Exhibit 803, and

23   I believe we stopped at timestamp 28:02.

24              MS. KASSNER:  If we could continue playing where we

25   had left off on cross at 28:02 of Government Exhibit 803.

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

1  Q    And before we do that, I just want to refer you to the

2  transcript, tab 830, and it's -- it begins, I believe, on Page

3  15 of tab 803 in the back of the binder.  So this is just

4  starting where we left off.

5              (Audio recording played.)

6              MS. KASSNER:  If we could pause here.

7              (Audio recording stopped.)

8  Q    Based on your discussion with the defendant on -- in this

9  section of the recording which was an November 27th, 2018, do

10  you have an understanding -- what was your understanding of

11  why the defendant's partner's money was seized?

12  A    My understanding was that his partner's money was seized

13  because he was effectively laundering drug money and it was

14  seized because of that.

15  ███ ███████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████

18        ██████████████  ████████████████████

19        ████████████  ██████████

20        ██████████████████  ████████████████████

21  ████████████

22        ██████████████  ████████████  ████████████

23        ██████████████  ████████████  ██████████████

24        ██████████████  ████████████  ████████████  ██████████

25  ██████████████  ██████████████████  ████████████████

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER